**Kevin CORNWELL et al., Plaintiffs,**

v.

**CREDIT SUISSE GROUP
et al., Defendants.**

**No. 08 Civ. 3758(VM).**

United States District Court,
S.D. New York.

July 27, 2010.

Opinion Denying Reconsideration
Aug. 11, 2010.

Bernard M. Gross, Deborah R. Gross, The Law Office of Bernard M. Gross, P.C., Philadelphia, PA, Darren J. Robbins, David C. Walton, Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, David Avi Rosenfeld, Samuel Howard Rudman, Jarrett Scott Charo, Marisa N. Demato, Robbins Geller Rudman & Dowd LLP, Melville, NY, Beth Ann Kaswan, Scott + Scott, L.L.P., Paul J. Scarlato, Jonathan Gardner, Labaton Sucharow LLP, New York, NY, William H. Narwold, Motley Rice LLC, Hartford, CT, Elizabeth S. Smith, John Brandon Walker, Motley Rice LLC, Mount Pleasant, SC, for Plaintiffs.

Richard W. Clary, Cravath, Swaine & Moore LLP, New York, NY, for Defendants.

Thomas Livezey Laughlin, IV, Scott + Scott, L.L.P., New York, NY.

### *CORRECTED DECISION AND ORDER*

VICTOR MARRERO, District Judge.

Plaintiffs Kevin Cornwell ("Cornwell"), John M. Grady ("Grady"), and Louisiana Municipal Police Employees Retirement Systems ("LAMPERS") (collectively, "Plaintiffs") filed a Second Amended Class Action Complaint dated March 10, 2010 (the "Complaint"), naming as defendants Credit Suisse Global ("CSG"), Brady W. Dougan, Renato Fassbind, D. Wilson Ervin, and Paul Calello (collectively, "Defendants"). Plaintiffs assert claims under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) ("§ 10(b)"), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Plaintiffs bring these claims on behalf of themselves and all other persons or entities, except for Defendants, who, during the period February 15, 2007 through April 14, 2008, purchased CSG securities either on the Swiss Stock Exchange ("SWX") or as American Depositary Shares ("ADSs") on the New York Stock Exchange ("NYSE").

On June 24, 2010, the United States Supreme Court issued *Morrison v. National Australia Bank*, —— U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), which set forth a new rule for determining the extraterritorial application of the United States securities laws. Invoking *Morrison*, Defendants moved via letter on July 6, 2010 for a partial judgment on the pleadings to dismiss plaintiffs, such as LAMPERS, who had purchased CSG shares on the SWX. Letter-briefs from each party were submitted to the Court on July 19, 2010.

For the reasons discussed below, Defendants' motion is GRANTED.

## I. BACKGROUND

The facts as alleged in the Complaint in this case are set forth in detail in prior Decisions and Orders of the Court. *See Cornwell v. Credit Suisse Group*, 689 F.Supp.2d 629 (S.D.N.Y.2010); *Cornwell v. Credit Suisse Group*, 666 F.Supp.2d 381 (S.D.N.Y.2009). As relevant for the motion at hand, Plaintiffs allege that Defendants made material misrepresentations or omissions concerning the robustness of CSG's risk management practices (which were actually very poor), CSG's financials were heavily impacted by the implosion of the American housing market (which their risk management practices were supposed to prevent), and Plaintiffs were injured by the concomitant devaluation of their stock. Plaintiffs are divided into two categories: (1) those such as Cornwell and Grady who purchased ADSs on the NYSE and (2) those such as LAMPERS who are United States residents who purchased shares of CSG on the SWX. (*See* Complaint ¶¶ 1, 2, 20, 34–36, 346–47, 354(a); *see also id.* ¶ 24 ("U.S. institutional investors, and other U.S. residents, routinely purchase Credit Suisse shares trading on the SWX from their offices in the United States.").)

Plaintiffs contend that *Morrison* does not prevent the latter group from maintaining their claims. Their chief argument is that *Morrison* is limited to its facts and applies only to so-called "foreign cubed" plaintiffs—foreign plaintiffs who bought foreign stock on a foreign exchange. To bolster this conclusion, Plaintiffs suggest that "the real question left open by *Morrison* ... is what factors control when a purchase or sale has some foreign and some domestic 'aspects.'" (Plaintiffs' Letter–Brief dated July 19, 2010 at 3.) To answer this question, Plaintiffs suggest, a court must consider "the text and purpose of the [Exchange Act]" as well as "inter-

pret[ations of] the terms 'purchase' and 'sale' in the context of § 10(b) and common law principles prevailing at the time the [Exchange Act] was enacted." (*Id.*) In particular, the Court should consider choice of law principles as described in the 1934 edition of the Restatement (First) of Conflict of Laws. (*See id.* at 3–5.) Application of these considerations, Plaintiffs contend, would reveal that LAMPERS "made an investment decision and initiated a purchase of CSG from the U.S." and "took the CSG stock into its own account in the U.S. and incurred an economic risk in the U.S." (*Id.* at 3.) Thus, Lead Plaintiffs conclude that merely because LAMPERS' stock "order was settled overseas on the [SWX]" does not prevent § 10(b) from applying. (*Id.*) As described below, the Court is not persuaded that the Supreme Court had such a multi-factor analysis in mind when it issued *Morrison*.

## II. DISCUSSION

In *Morrison*, the Supreme Court roundly (and derisively) buried the venerable "conduct or effect" test the Second Circuit devised and for years had employed to determine whether the protections and remedies contained in § 10(b) of the Exchange Act apply extraterritorially to reach fraudulent securities transactions abroad under the facts of a case. Yet here, Plaintiffs seek to exhume and revive the body. They argue that § 10(b) claims by investors such as LAMPERS survive *Morrison* on the grounds that such plaintiffs are American citizens, and that some aspects of the foreign securities transactions at issue occurred in the United States. This Court is not persuaded. As this Court reads *Morrison*, the conduct and effect analysis as applied to § 10(b) extraterritoriality disputes is now dead letter. Plaintiffs' cosmetic touch-ups will not give the corpse a new life. The standard the *Morrison* Court promulgated to gov-

ern the application of § 10(b) in transnational securities purchases and sales does not leave open any of the back doors, loopholes or wiggle room to accommodate the distinctions Plaintiffs urge to overcome the decisive force of that ruling on their § 10(b) claims here.

The Second Circuit's case law interpreting the extraterritorial application of § 10(b) focused on whether wrongful conduct associated with a particular transaction (1) had a substantial effect on United States markets or upon American citizens, or (2) occurred in the United States. *See SEC v. Berger,* 322 F.3d 187, 192–93 (2d Cir.2003); *Schoenbaum v. Firstbrook,* 405 F.2d 200, 206 (2d Cir.1968) (finding that § 10(b) was "necessary to protect American investors"); *see also Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir.1972) (applying § 10(b) to encompass a transaction involving an American company that was fraudulently induced to purchase in England the securities of a corporation whose shares were not traded on any American exchange, and where some of the acts that comprised the deceptive conduct occurred in the United States). The *Morrison* Court unequivocally repudiated this longstanding jurisprudence. It found the rule inconsistent with the presumption against extraterritorial application of statutes, and not supported by any provision of the Exchange Act evincing Congress' clear intent to extend the remedies of the law to foreign securities transactions.

Textually, the *Morrison* Court not only found no affirmative language in the Exchange Act to suggest that § 10(b) extends to foreign transactions, it rejected both the Second Circuit's extraterritoriality doctrine as well as the Government's amicus argument, which had suggested that § 10(b) or the Exchange Act in general has at least some application abroad, and which proposed an alternative "significant and material conduct" rule derived as a variation of the Second Circuit's conduct test. *See Morrison,* 130 S.Ct. at 2881–83, 2886–87. In fact, the Court noted that while § 10(b) lacks a clear expression of extraterritorial effect, in §§ 30(a) and 30(b) of the Exchange Act, Congress explicitly provided for application of the statute to certain transactions abroad, but limited the scope to very narrow circumstances.[1]

In stating its threshold conclusion that § 10(b) has no extraterritorial effect and affirmatively enunciating the new rule specifying the transactions to which § 10(b) does apply, the Supreme Court declared that the purchases and sales which comprise the objects of the Exchange Act's "solicitude," *id.* at 2883–84—the dealings the statute seeks to regulate and the investors it seeks to protect—narrow exclusively to domestic transactions, specifically "[1] *only* ... the purchase or sale of a security listed on an American exchange, and [2] the purchase or sale of any other security in the United States." *Id.* at 2888 (emphasis added). The determinant of the first factor is the listing of the security in a domestic exchange, and that of the second factor is the occurrence of the purchase or sale within United States territory. A corollary of this rule embodies its converse: that § 10(b) would *not* apply to transactions

---

**1.** Section 30(a) specifically covers only prohibited transactions effected on a foreign exchange involving securities of which the issuer resides in, is organized under, or has its principal place of business within the United States. *See* 15 U.S.C. § 78dd(a). And § 30(b) bars application of the statute to any securities transaction outside the jurisdiction of the United States unless it is done in violation of regulations of the Securities and Exchange Commission issued to prevent evasions of the Exchange Act. *See* 15 U.S.C. § 78dd(b).

involving (1) a purchase or sale, wherever it occurs, of securities listed only on a foreign exchange, or (2) a purchase or sale of securities, foreign or domestic, which occurs outside the United States. In either case, a threshold event determines the applicability of § 10(b): an actual purchase or sale of covered securities.

*Morrison* makes clear that in overturning a generation of Second Circuit precedent, despite the preeminence of its pedigree and however well-established its grounding in other circuit case law, the Supreme Court sought to strike at the complexity, vagueness, inconsistency and unpredictability engendered by the conduct and effect analysis in many cases. *See id.* at 2879–81 (noting that the conduct and effect tests "were not easy to administer" and hence that the widespread criticism of them by commentators, governments and courts seemed justified). Instead, as also evident in its majority opinion, the Court manifested an intent to weed the doctrine at its roots and replace it with a new bright-line transactional rule embodying the clarity, simplicity, certainty and consistency that the tests from the Second and other circuits lacked.

Nothing in the plain language of the Supreme Court's new test, or in the contextual circuit court case law that prompted it, suggests that *Morrison* envisions the exceptions and embellishments with which Plaintiffs seek to burden the rule even before it settles in the law books. In essence, Plaintiffs would exclude from operation of the new test transactions in securities traded only on exchanges abroad if the purchase or sale involves American parties, or if some aspects or contacts of such foreign transactions occur in the United States. But insofar as this proposition superimposes an exclusion based strictly on the American connection of the purchaser or seller, it simply amounts to a restoration of the core element of the effect test. Similarly, to carve out of the new rule a purchase or sale of securities on a foreign exchange because some acts that ultimately result in the execution of the transaction abroad take place in the United States amounts to nothing more than the reinstatement of the conduct test.

Specifically, this exception carries the markings of the "merely preparatory activities" doctrine devised by the Second Circuit under the conduct test, which required inquiry into whether particular steps taken in the United States in connection with a securities transaction consummated abroad were too preliminary to constitute sufficient wrongful conduct in this country, or instead served wrongdoers to use the United States as a base to perpetrate securities fraud abroad. *See, e.g., Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 992 (2d Cir.1975); *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1017 (2d Cir.1975). The creation of such an exception to the *Morrison* transactional rule necessarily would invite extensive analysis required to parse foreign securities trades so as to assess quantitatively how many and which parts or events of the transactions occurred within United States territory, and then to apply value judgments to determine whether the cluster of those activities sufficed to cross over the threshold of enough domestic contacts to justify extraterritorial application of § 10(b). The complexity inherent in such far-reaching inquiries and fine-line judgments in practice formed a central element of the *Morrison* Court's "damning indictment" of the conduct and effect tests. 130 S.Ct. at 2879–80.

Thus, Plaintiffs' arguments not only ignore the absence of textual grounding in *Morrison's* new transactional test, they defeat the various purposes the Supreme Court's rule seeks to achieve. Nor can Plaintiffs escape the reality, expressed by the *Morrison* Court as a substantial con-

cern, that by applying § 10(b) to reach the foreign securities at issue here, this Court would be called upon to enforce American laws regulating transactions in securities that are also governed by the laws of the foreign country and exchanges where those securities were actually purchased or sold.

■ Plaintiffs make much of the narrow facts and limited disputes actually at issue in *Morrison,* on this point stressing that the case involved a classic instance of a so-called foreign-cubed transaction—foreign securities purchased by foreign parties on a foreign exchange—to which § 10(b) clearly did not apply. They therefore urge that the decision should be confined to its facts and limited holding, and that all the language the majority opinion expended amplifying its judgment, fraught as it is with larger implications, should be dismissed as mere dictum. This Court is not convinced that the Supreme Court designed *Morrison* to be squeezed, as in spandex, only into the factual strait jacket of its holding. As a point of departure, even if everything the Supreme Court said in elaborating its decision were deemed dictum, "it does not at all follow that [this Court] can cavalierly disregard it," especially where the Supreme Court "is providing a construction of a statute to guide the future conduct of inferior courts." *United States v. Bell,* 524 F.2d 202, 206 (2d Cir. 1975). As the Second Circuit has instructed, though Supreme Court dictum may not be binding, "it must be given consideration and weight and can not be ignored in the resolution" of the issue at hand. *Id.; see also United States v. Oshatz,* 912 F.2d 534, 540 (2d Cir.1990) (recognizing that "in some contexts expressions of views by an appellate court must be regarded as the law of the circuit, even though not an announcement of a holding or even a necessary step in the reasoning leading to a holding." (*citing Bell,* 524 F.2d at 205–06)); *Columbia Broad. Sys. v. American S. of*

*Composers, Authors & Publishers,* 620 F.2d 930, 935 (2d Cir.1980) (noting that while the safer course is to read judicial opinions for what they purport to decide, "[t]hat may not always be only the narrow holding, for courts … have an entirely legitimate function of elucidating principles of law, fairly raised by litigation, even if the resulting pronouncements are not absolutely required for the precise decision reached. Appellate guidance is not valueless because it is dictum.").

A careful reading of *Morrison* evinces that the majority reached beyond the four corners of the case before it and went out of its way to fashion a new rule designed to correct the enumerated flaws the Court found in the Second Circuit's tests, while also fully aware of its far broader implications. As the concurring opinions of both Justice Breyer and Justice Stevens point out, had the majority confined its ruling strictly to the facts presented, it would have been unnecessary for it to stretch outside the bounds of the case so as to trash the Second Circuit's conduct and effect doctrine so unceremoniously and then fashion an entirely new rule cut out of whole cloth. *See id.* at 2888 (Breyer, J., concurring) (noting that because the relevant facts placed the foreign transaction in question squarely outside the territorial scope of § 10(b), "[t]his case does not require us to consider other circumstances."); *id.* at 2892–94, 2894–95 (Stevens, J., concurring) (noting that no party to the litigation "contends that § 10(b) applies to wholly foreign frauds," and thus that there was no justification for the majority to repudiate the prevailing circuit court jurisprudence and enunciate the Court's "novel rule").

In fact, read as a whole, the *Morrison* opinions indicate that the Court considered that under its new test § 10(b) would not extend to foreign securities trades executed on foreign exchanges even if purchased

or sold by American investors, and even if some aspects of the transaction occurred in the United States. In dispatching the conduct and effect rule, the *Morrison* Court was fully cognizant that one of the hallmarks of the discarded tests depended on whether "the harmed investors were Americans or foreigners." *Id.* at 2879 (reading the Second Circuit rule to hold that "[w]hen the alleged damages consisted of losses to American investors abroad, it was enough that acts of material importance performed in the United States significantly contributed to that result" (quotation marks omitted)).

Moreover, the Supreme Court also signaled that the geographic exception which Plaintiffs seek to carve here for foreign transactions on the basis of the occurrence of some activities or contacts in the United States would not satisfy the new rule. First, the Court recognized that even in strictly foreign securities purchases or sales to which the reach of § 10(b) squarely does not extend, some connection of the transaction with the United States is always highly likely. *See id.* at 2884 (noting that "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States" and that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case" (emphasis in original)). Second, in laying the groundwork for its new rule, the Court concluded that the place where the wrongful conduct began is not controlling. *See id.* ("[T]he focus of the Exchange Act is not upon the place where the deception originated . . . ."); *id.* at 2885 ("[W]e reject the notion

that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad . . . ."); *see also Stackhouse v. Toyota Motor Co.*, CV–10–0922, at 2, 2010 WL 3377409 (C.D.Cal. July 16, 2010) (the "position . . . better supported by *Morrison*" is that a United States resident purchasing stock on a foreign exchange "has figuratively traveled to that foreign exchange—presumably via a foreign broker—to complete the transaction.").

That the Supreme Court considered and was entirely aware that its new test would preclude extraterritorial application of § 10(b) to foreign securities transactions involving alleged wrongful conduct that could cause harm to American investors in the United States, or that entail the occurrence of some acts in the United States in furtherance of the purchase or sale, is further underscored by the Court's reference to *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (*"Aramco"*). The Court cited *Aramco* to support the proposition that the presumption against extraterritorial effect should not be diminished just because "*some* domestic activity is involved in the case." 130 S.Ct. at 2884 (emphasis in original). The *Morrison* Court further noted that in *Aramco*, which rejected the extraterritorial application of Title VII of the Civil Rights Act of 1964, the plaintiff had been hired in Houston and was an American citizen. In this connection, the Court voiced concern over the prospect of incompatibility of American securities rules with applicable laws and procedures of foreign countries which also regulate securities exchanges and transactions that occur within their territory.[2]

---

**2.** Further evidence that the *Morrison* Court understood the consequences of its bright line rule to American investors in foreign transactions, even when some acts related to the purchase or sale occur in the United States, is found in the concurring opinion of Justice

Stevens. Illustrating what he described as the "drawbacks" of the Court's new test, Justice Stevens cited the following example, which the majority did not challenge:

Plaintiffs' arguments here, insofar as premised on the occurrence of some aspects of the transactions at issue within the United States to justify application of § 10(b) to their purchases of foreign securities listed in a foreign exchange, ignore the multiple concerns that moved the Supreme Court to prescribe a new test clarifying the application of § 10(b) in transnational securities trading. In that restructuring of United States securities law, the Second Circuit's conduct and effect doctrine took a great fall. And neither the Plaintiffs' law horses nor this Court's pen can put the pieces together again.[3]

## III. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motion for judgment on the pleadings of defendants Credit Suisse Global, Brady W. Dougan, Renato Fassbind, D. Wilson Ervin, and Paul Calello is GRANTED; it is further

**ORDERED** that the claims of plaintiff Louisiana Municipal Police Employees Retirement Systems asserted under Section 10(b) of the Exchange Act of 1934 are dismissed from this action.

**SO ORDERED.**

## *DECISION AND ORDER*

By Decision and Order dated July 27, 2010 (the "July 2010 Decision")[1], the Court granted the motion of defendants Credit Suisse Group ("CSG"), Brady W. Dougan, Renato Fassbind, D. Wilson Ervin, and Paul Calello (collectively, "Defendants"), for a judgment on the pleadings. The July 2010 Decision dismissed plaintiff Louisiana Municipal Police Employees Retirement Systems ("LAMPERS") and similarly-situated potential class members

---

Imagine ... an American investor who buys shares in a company listed only on an overseas exchange. That company has a major American subsidiary with executives based in New York City; and it was in New York City that the executives masterminded and implemented a massive deception which artificially inflated the stock price and which will, upon disclosure, cause the price to plummet. Or imagine that those same executives go knocking on doors in Manhattan and convince an unsophisticated retiree, on the basis of material misrepresentations, to invest her life savings in the company's doomed securities. Both of these investors would, in the Court's new test, be barred from seeking relief under § 10(b).

... Indeed, the Court's rule turns § 10(b) jurisprudence (and the presumption against extraterritoriality) on its head, by withdrawing the statute's application from cases in which there is *both* substantial wrongful conduct that occurred in the United States *and* a substantial injurious effect on United States markets and citizens.

*Id.* at 2895 (Stevens, J., concurring) (emphasis in original). Summarizing his objections to the majority's new rule, Justice Stevens later noted that the test "pays short shrift to the United States' interest in remedying frauds that transpire on American soil or harm American citizens...." *Id.* at 2895.

3. For whatever comfort it may bring to Plaintiffs and counsel, and however much restoration of the Second Circuit's pride and vindication of its venerable jurisprudence it is worth, the Court notes that in legislation recently enacted, Congress explicitly granted federal courts extraterritorial jurisdiction under the conduct or effect test for proceedings brought by the SEC, and called for further SEC study and report on the issue in regard to extraterritorial private rights of action. *See* Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub.L. No. 111–203, §§ 929P(b), 929Y, 124 Stat. 1376 (July 21, 2010).

1. The July 2010 Decision is reported as *Cornwell v. Credit Suisse Group*, 08 Civ. 3758, 729 F.Supp.2d 620, 2010 WL 3069597 (S.D.N.Y. July 27, 2010). The facts in this case are set forth in detail in other prior Decisions and Orders of the Court. *See Cornwell v. Credit Suisse Group*, 689 F.Supp.2d 629 (S.D.N.Y. 2010); *Cornwell v. Credit Suisse Group*, 666 F.Supp.2d 381 (S.D.N.Y.2009).

who had purchased CSG securities on the Swiss Stock Exchange ("SWX"). The July 2010 Decision relied primarily on the United States Supreme Court's recent decision in *Morrison v. National Australia Bank,* —— U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), which set forth a new "transactional" rule for determining the extraterritorial application of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) ("§ 10(b)"), which was the prime engine for LAMPERS' claims against Defendants. The Court determined that *Morrison* foreclosed the application of § 10(b) to any claims related to foreign securities trades executed on foreign exchanges even if purchased by American investors.

LAMPERS now moves for an order pursuant to Local Civil Rule 6.3 ("Rule 6.3") granting reconsideration. LAMPERS' submission in support of the instant motion reiterates essentially the same arguments made in opposition to Defendants' motion for a judgment on the pleadings, points that this Court fully considered and found unpersuasive.

LAMPERS also moves to have its dismissal from this lawsuit certified as final under Fed.R.Civ.P. 54(b) so that it may immediately appeal *Morrison*'s application to this case.

## I. *STANDARD OF REVIEW*

Reconsideration of a previous order by the court is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Sys. Inc. Sec. Litig.,* 113 F.Supp.2d 613, 614 (S.D.N.Y.2000) (citations and quotation marks omitted). "The provision for reargument is not designed to allow wasteful repetition of arguments already briefed, considered and decided." *Schonberger v. Serchuk,* 742 F.Supp. 108, 119 (S.D.N.Y. 1990). "The major grounds justifying re-

consideration are 'an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atl. Airways, Ltd. v. National Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992) (*erupting* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478 at 790). To these ends, a request for reconsideration under Rule 6.3, which governs motions for reconsideration, must demonstrate controlling law or factual matters put before the court in its decision on the underlying matter that the movant believes the court overlooked and that might reasonably be expected to alter the conclusion reached by the court. *See Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). Rule 6.3 is intended to "'ensure the finality of decisions and to prevent the practice of a losing party ... plugging the gaps of a lost motion with additional matters.'" *S.E.C. v. Ashbury Capital Partners,* No. 00 Civ. 7898, 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001) (*quoting Carolco Pictures, Inc. v. Sirota,* 700 F.Supp. 169, 170 (S.D.N.Y.1988)). A court must narrowly construe and strictly apply Rule 6.3 so as to avoid duplicative rulings on previously considered issues and to prevent Rule 6.3 from being used to advance different theories not previously argued, or as a substitute for appealing a final judgment. *See Montanile v. National Broad. Co.,* 216 F.Supp.2d 341, 342 (S.D.N.Y.2002); *Shamis v. Ambassador Factors Corp.,* 187 F.R.D. 148, 151 (S.D.N.Y.1999).

## II. *DISCUSSION*

LAMPERS urges reconsideration on the basis of essentially the same arguments that were raised in briefing on the original motion to dismiss. The motion at hand cites no controlling law or factual matters the Court overlooked that might reasonably be expected to alter the outcome of

the July 2010 Decision. Indeed, the Court took into account and rejected the various considerations LAMPERS asserts as grounds for this motion.

Specifically, LAMPERS disagrees with the Court's conclusion that claims related to securities transactions on foreign exchanges are not cognizable under § 10(b). In support, LAMPERS rehashes arguments made in its original submission that *Morrison* compels lower courts to adopt common law standards from more than 75 years ago—*i.e.* those in force at the time § 10(b) was originally adopted—when considering § 10(b) claims, a consideration completely unaddressed by *Morrison.* LAMPERS also attempts retroactive mind reading and argues that Justice Scalia's majority opinion in *Morrison* does not support this Court's conclusion because Justice Scalia's opinion did not respond to a specific comment made by Justice Stevens' concurring opinion. Finally, LAMPERS raises a novel argument, available to it when making its original submission, that because CSG securities are listed on the New York Stock Exchange, purchases of CSG securities on the SWX are indistinguishable from those that occurred on domestic exchanges. Whatever the merits of this argument may be, it is inappropriately raised for the first time on a motion for reconsideration.

Because LAMPERS has failed to identify any controlling law or factual matters put to the Court on the underlying motion that the Court demonstrably did not consider, LAMPERS' motion for reconsideration is DENIED.

### III. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motion of plaintiff Louisiana Municipal Police Employees Retirement Systems ("LAMPERS") for reconsideration (Docket No. 87) of the Court's Decision and Order dated July 27, 2010 is DENIED; it is further

**ORDERED** that defendants Credit Suisse Group, Brady W. Dougan, Renato Fassbind, D. Wilson Ervin, and Paul Calello are directed to inform the Court, by letter-brief submitted not later than August 18, 2010, and not to exceed three pages, whether they oppose LAMPERS' request for the Court to certify as a final judgment pursuant to Fed.R.Civ.P. 56(b) LAMPERS' dismissal from this lawsuit.

**SO ORDERED.**