ELLIOTT ASSOCIATES,
et al., Plaintiffs,

v.

PORSCHE AUTOMOBIL HOLDING
SE, f/k/a Dr. Ing. h.c.F Porsche AG;
Wendelin Wiedeking; and Holger P.
Haerter, Defendants.

Black Diamond Offshore, Ltd.,
et al., Plaintiffs,

v.

Porsche Automobil Holding SE, f/k/a
Dr. Ing. h.c.F Porsche AG; Wendelin
Wiedeking; and Holger P. Haerter,
Defendants.

Nos. 10 Civ. 0532(HB),
10 Civ. 4155(HB).

United States District Court,
S.D. New York.

Dec. 30, 2010.

David Parker, Kleinberg, Kaplan, Wolff
& Cohen, P.C., New York, NY, Ashley C.
Keller, James B. Heaton, III, John D.

Byars, Kasper J. Stoffelmayr, Philip S. Beck, Vincent S.J. Buccola, Bartlit Beck Herman Palenchar & Scott LLP, Chicago, IL, for Plaintiffs.

Gandolfo Vincent DiBlasi, Christopher James Dunne, Suhana S. Han, Alexander John Willscher, Katherine Jane Stoller, Robert Joseph Giuffra, Jr., Sullivan and Cromwell, LLP, Jay B. Kasner, Scott D. Musoff, Skadden, Arps, Slate, Meagher & Flom LLP, Michael Joseph Chepiga, Alexandra Carrington Pitney, Emma Louise Lindsay, Paul C. Curnin, Simpson Thacher & Bartlett LLP, New York, NY, for Defendants.

HAROLD BAER, JR., District Judge:

Before the Court are two actions brought by a group of global hedge funds against Porsche Automobil Holding SE ("Porsche"), the German car manufacturer, and two of its executive officers, Wendelin Wiedeking and Holger Haerter (the "Individual Defendants"). Plaintiffs allege that they entered into securities-based swap agreements that referenced the share price of another German car company, Volkswagen ("VW"), which is not a party to this action. According to Plaintiffs, Porsche, along with Wiedeking and Haerter, caused a dramatic rise in VW stock prices by buying nearly all the freely-traded voting shares of VW as part of a secret plan to take over that company. On October 26, 2008, when Porsche revealed its holdings in VW, the share price shot up and caused enormous losses to Plaintiffs, who stood to benefit through their swap agreements from decreases in the VW share price. Plaintiffs allege that Defendants violated section 10(b) of the Exchange Act and Rule 10b–5 when Porsche falsely denied its intent to take over VW, and engaged in a series of manipulative derivatives trades to hide the extent to which the company controlled VW shares. In addition, Plaintiffs allege violations of § 20(a) of the Exchange Act and a cause of action for common law fraud.

The first action against Porsche, *Elliott Associates, L.P. et al. v. Porsche Automobil Holding SE, et al.*, No. 10 Civ. 532, was filed on January 25, 2010 ("*Elliott*"). Plaintiffs twice amended their complaint, on April 28, 2010 and June 4, 2010. In the meantime, a second action involving substantially the same allegations was filed on May 20, 2010 under the caption *Black Diamond Offshore Ltd. et al. v. Porsche Automobil Holding SE*, No. 10 Civ. 4155 ("*Black Diamond*"). The actions were consolidated by my order dated June 22, 2010. Following the Supreme Court's decision later that week in *Morrison v. National Australia Bank*, —— U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) ("*Morrison*"), the parties agreed that amended complaints were necessary in both actions. The Third Amended Complaint ("TAC") in *Elliott* and the Amended Complaint ("AC") in *Black Diamond* were filed on July 21, 2010 and July 23, 2010, respectively.

Defendants moved to dismiss both Complaints, and delivered fully-briefed motions to the court on October 26, 2010. I heard oral argument on the motions on December 7, 2010. For the reasons that follow, Defendants' motions to dismiss the TAC and the AC are hereby granted.[1]

---

1. Just before the *Elliott* and *Black Diamond* motions to dismiss were fully-briefed, four related actions were filed, all alleging violations of § 10(b) and Rule 10b–5 by Porsche, Wiedeking, and Haerter in connection with the same operative facts alleged in the TAC and the AC. The "new actions" are *Viking Global Equities LP et al. v. Porsche Automobil Holding SE*, No. 10 Civ. 8073; *Parkcentral Global Hub Limited v. Porsche Automobil Holding SE*, No. 10 Civ. 8074; *Bluemountain Equity Alternatives Master Fund L.P. v. Porsche Automobil Holding SE et al.*, No. 10 Civ. 8084; and *Seneca Capital LP et al. v.*

## I. Factual Background

*The Parties*

Plaintiffs in the *Elliott* action are 35 hedge funds, 18 of which are organized under the laws of foreign jurisdictions. The funds are managed by nine investment managers, all of whom are located in New York. TAC ¶¶ 34–68. Plaintiffs in the *Black Diamond* action are four hedge funds, each of which is organized under the laws of the Cayman Islands. The *Black Diamond* funds are managed by Carlson Capital, L.P., a limited partnership domiciled in Delaware and headquartered in the state of Texas. AC ¶¶ 15–19.

Plaintiffs entered into security-based swap agreements that referenced the price of VW shares.[2] TAC ¶ 2; AC ¶ 39. Swap agreements are "privately negotiated contracts that are not traded on any exchanges." Pl. Mem. Opp. at 9; Porsche Moving Mem. at 2. Simply put, the contracts at issue here fluctuated in value as the price of VW shares rose or fell. The swap agreements generated gains for Plaintiffs as the price of VW shares declined and generated losses as the price of VW shares rose. *Id.*

Plaintiffs allege that investment decisions relating to their VW holdings were made by the US-based investment managers. *See* TAC ¶¶ 88, 149–153; AC ¶ 39. The *Elliott* Plaintiffs claim that all steps necessary to transact the swap agreements were carried out in the United States, and investment managers in New York signed swap confirmations at their offices in this state. TAC ¶¶ 149–153. Furthermore, the swap agreements at issue in the *Elliott* action are all alleged to contain express choice of law provisions stating that New York law governs the agreements and forum selection clauses designating New York federal and state courts. *Id.* The *Black Diamond* Plaintiffs allege that all steps necessary to transact the security-based swap agreements at issue in that action were carried out in Dallas, Texas, with counterparties acting on behalf of financial institutions located in New York. Like the swaps at issue in *Elliott,* the *Black Diamond* swaps are alleged to have been governed by New York law. AC ¶ 39. Notably, neither Complaint appends a copy of any swap agreement, and none of the Plaintiffs spell out the identity of a counterparty.

Defendant Porsche is organized under the laws of the European Union and Germany, and is headquartered in Stuttgart, Germany. AC ¶ 21. Although Porsche is a public company, with its non-voting preferred shares traded in Germany, until the end of 2008 all of its ordinary voting shares were owned by the members of the Porsche and Piech families, who are descendants of the company founder. *See* DiBlasi Decl., Exs. 1, 2. Porsche also had an American Depositary Receipt ("ADR")

---

*Porsche Automobil Holding SE,* No. 10 Civ. 8161. It was agreed by all parties that my rulings on the instant motions would apply in the new actions. *See* Stipulation & Order, Nov. 18, 2010 ("The Court's rulings in the Motion to Dismiss shall apply in the New Actions, to the extent applicable, as if the Court had issued those rulings in the New Actions."). Accordingly, the Complaints in all four of the above-listed actions shall be dismissed. The state law claims for unjust enrichment (asserted in *Bluemountain,* 10

Civ. 8084) and for tortious interference with prospective economic advantage (asserted in *Seneca Capital,* 10 Civ. 8161) are dismissed for the same reasons I dismiss the common law fraud claims in the instant actions. *See infra* p. 477.

2. The *Elliott* Plaintiffs also allege that they held direct positions in VW shares, but base their claims in the TAC on the swap-based short positions that they held during the period leading up to Porsche's October 26, 2008 announcement. *See* TAC ¶ 2.

that traded over the counter in the United States. TAC ¶ 76(f). During the relevant period, Defendant Wiedeking is alleged to have served as Porsche's CEO, and Defendant Haerter as Porsche's Vice President of Finance. TAC ¶¶ 70–71; AC ¶¶ 22–23. Both individual defendants are German citizens who reside in Germany.

VW is a German corporation, headquartered in Wolfsburg, Germany. AC ¶ 52. VW-issued ADRs trade over the counter in the United States. TAC ¶¶ 92, 95; AC ¶ 54. During the relevant period, the German State of Lower Saxony owned just over 20% of VW shares. TAC ¶ 6; AC ¶ 65. In 1960, the German government enacted legislation (the "VW Act") to protect VW from a hostile takeover, pursuant to which any holder of VW Shares was limited to 20% of the voting power, and approval by 80% of VW shareholders was required for a takeover, instead of the typical 75% threshold under German law. See TAC ¶ 6. In 2004, the European Commission found that the VW Act violated European Union law because its effect was to make VW shares less attractive to investors throughout Europe, thereby hindering the free movement of capital. See DiBlasi Decl., Ex. 7 at 1. In light of the uncertain status of the VW Act, and a longstanding relationship between Porsche and VW, Porsche decided to increase its share ownership in VW. TAC ¶¶ 97–107; AC ¶¶ 55–59. Its holdings increased continually from 2005 through 2007. TAC ¶¶ 97, 99, 102, 106; DiBlasi Decl. Exs. 10, 11.

*Porsche's Accumulation of VW Shares*

By the end of 2007, Porsche was VW's largest shareholder, with approximately 31% of VW shares. TAC ¶ 109; AC ¶ 59. The State of Lower Saxony continued to hold just over 20% of VW's shares. *Id.* Plaintiffs allege that on February 25, 2008, representatives of Porsche held a meeting in Berlin with an officer of the State of Lower Saxony, at which Porsche informed the government officer that it intended to acquire at least 75% of VW shares. TAC ¶ 6; AC ¶ 89. On March 3, 2008, Porsche publicly announced its intention to acquire "more than [a] 50%" stake in VW, without saying anything about a goal of 75% ownership. TAC ¶ 83(1); AC ¶ 32. A week later, on March 10, Porsche allegedly denied any plans to reach 75% holdings in VW, noting that Lower Saxony's 20% ownership of VW made it very unlikely that Porsche could accumulate such a significant percentage of VW shares. TAC ¶¶ 83(m), 114; AC ¶ 90; DiBlasi Decl. Ex. 15.

Plaintiffs allege that during the first three quarters of 2008, Porsche continued to make statements in which it denied that it was seeking to take over VW. See TAC ¶¶ 111, 120, 122, 127, 130, 137; AC ¶¶ 33, 87–89, 94–100, 105–13. Plaintiffs allege that these statements were false and misleading, because Porsche had already disclosed privately to the government of Lower Saxony that it planned to take over VW, and because at least one Porsche insider allegedly admitted he knew by mid–2008 about Porsche's takeover plan. See TAC ¶ 125. Furthermore, the Complaints allege that as late as September 2008, Porsche continued to deny that it had the ability to acquire 75% ownership of VW, while at the same time it continued to acquire VW shares toward the goal of reaching 75%. TAC ¶ 116; AC ¶¶ 91–93.

*Porsche's October 26, 2008 Disclosure and the Subsequent Short Squeeze*

On October 26, 2008, Porsche announced that it had accumulated a total of 74.1% of VW shares. This announcement, in a press release entitled "Porsche Heads for Domination Agreement," disclosed that Porsche held 42.6% of VW shares outright, and had also obtained another 31.5% own-

ership through a synthetic long position in cash-settled options to buy voting shares of VW. TAC ¶ 30; AC ¶ 75; DiBlasi Decl. Ex. 9. Plaintiffs allege that when coupled with Lower Saxony's 20% holdings and the 5% of VW shares held by index funds that were required to maintain VW shares as a specific proportion of their holdings, the entire remaining free float of the company was as little as 1%. TAC ¶ 8; AC ¶ 77. As a result of Porsche's disclosure, and the market's recognition of the scarcity of shares, the price of VW shares rose and forced Plaintiffs and other holders of short positions in VW to cover their positions at great cost.

Plaintiffs allege that this short squeeze was the result of misrepresentations and market manipulation by Porsche in violation of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and ultimately resulted in over $2 billion in losses by the Plaintiffs. TAC ¶ 3; AC ¶ 9. Initially, I must decide whether the acts alleged are even within the ambit of § 10(b), in light of the Supreme Court's recent pronouncement against the extraterritorial application of § 10(b) in *Morrison,* 130 S.Ct. 2869. That question necessarily precedes any inquiry into whether the acts constituted misrepresentations or market manipulations in violation of § 10(b), as alleged in Counts I and II of the TAC and the AC.

## II. Legal Standard

A complaint will be dismissed pursuant to Rule 12(b)(6) if there is a "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In deciding a motion to dismiss, a court ordinarily accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *Levy v. Southbrook Int'l Invs. Ltd.,* 263 F.3d 10, 14 (2d Cir.2001). In order to survive such a motion, however, "the plaintiff must pro-

vide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level,'" *ATSI Commc's, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007)(quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)), and to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). In securities fraud cases such as this, the complaint must also satisfy the particularity and other pleading requirements of the Private Securities Litigation Reform Act and Fed.R.Civ.P. 9(b).

In addition to well-pleaded factual allegations in the complaint, a court may consider documents attached to or incorporated by reference in the complaint as well as legally required public disclosure documents and documents possessed by or known to the plaintiff upon which it relied in bringing the suit. *ATSI Commc'ns,* 493 F.3d at 98.

## III. Plaintiffs' Section 10(b) Claims

### A. The Effect of Morrison v. NAB on Section 10(b) Claims

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).

In *Morrison,* the Supreme Court explained that § 10(b) applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." 130 S.Ct. at 2884. Since the swap agreements at issue here are clearly not listed on domestic

exchanges, the focus of my inquiry is whether they constitute "domestic transactions in other securities" within the ambit of § 10(b).

Prior to the Supreme Court's decision in *Morrison,* the Court of Appeals for the Second Circuit applied the "conduct test" and the "effects test" to determine whether the purchase or sale of any security not registered on a national securities exchange was subject to § 10(b). This required courts to evaluate "(1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens." *S.E.C. v. Berger,* 322 F.3d 187, 192–193 (2d Cir.2003), *abrogated by Morrison,* 130 S.Ct. 2869. If these tests, alone or in combination, were satisfied, then the purchase or sale of a security not registered on a national securities exchange was subject to § 10(b). *See Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,* 753 F.Supp.2d 166, 175–76, 2010 WL 3860397 at *6 (S.D.N.Y. Oct. 4, 2010).

In *Morrison,* the Supreme Court resolutely rejected the conduct and effects tests. *Morrison* identified several problems with the tests, though they formed a cornerstone of Second Circuit securities jurisprudence. First, the conduct and effects tests "failed to heed the traditional presumption against extraterritorial application of statutes; second, they lacked 'a textual or even extratextual basis'; and finally, they resulted in 'unpredictable and inconsistent application.'" *Id.* at 176, at *7 (citing *Morrison,* 130 S.Ct. at 2878–81, 2883). The Court rejected the doctrine applied in this Circuit and several others that § 10(b) had at least some application abroad, and announced that "the focus of the Exchange Act is not upon the place where the deception originated, but upon

purchases and sales of securities in the United States." Thus, the *Morrison* court changed the presumption long-held in this Circuit that the locus of deceptive conduct is relevant to the applicability of section 10(b). *See* 130 S.Ct. at 2884.

The Court established a "transactional test" to determine whether the purchase or sale of a security could be the subject of a section 10(b) suit: "whether the purchase or sale is made in the United States, or involves a security listed on a domestic exchange." *Id.* at 2886. Plaintiffs contend that after *Morrison,* whether § 10(b) applies to a transaction depends *only* on where the transaction occurs, and therefore, the antifraud provision applies whenever a transaction occurs in the United States. They argue that they signed confirmations for securities-based swap agreements in New York, and therefore engaged in "domestic transactions in other securities" within the scope of § 10(b).

Plaintiffs' narrow reading of *Morrison* is inconsistent with the Supreme Court's intention in that case to curtail the extraterritorial application of § 10(b). By striking down the conduct and effects tests, the Supreme Court sought to avoid "interference with foreign securities regulation that application of § 10(b) abroad would produce." *Id.* at 2886. For me to hold that the transactional test permitted a claim based on Plaintiffs' swap agreements would clearly, in my view, contravene the intention of the Supreme Court in *Morrison.* To do so would extend extraterritorial application of the Exchange Act's antifraud provisions to virtually any situation in which one party to a swap agreement is located in the United States.

Several courts in this district have already rejected the notion that "domestic transactions in other securities" include an investor's placement of a buy order in the United States for a security traded abroad.

*See Plumbers' Union*, 753 F.Supp.2d at 178, 2010 WL 3860397 at *9 ("As a general matter, a purchase order in the United States for a security that is sold on a foreign exchange is insufficient to subject the purchase to the coverage of section 10(b) of the Exchange Act."); *In re Societe Generale Secs. Litig.*, 2010 WL 3910286 at *6 (S.D.N.Y. Sept. 29, 2010) ("By asking the Court to look to the location of the 'the act of placing a buy order' and to ... 'the place of the wrong,' Plaintiffs are asking the Court to apply the conduct test specifically rejected in *Morrison* );" *Cornwell v. Credit Suisse Group*, 729 F.Supp.2d 620, 628, 2010 WL 3069597 at *7 (S.D.N.Y. Jul. 27, 2010) (*Morrison* "foreclose[d] the application of § 10(b) to any claims related to foreign securities trades executed on foreign exchanges even if purchased by American investors."). Thus, the question remains whether there is any distinction, for the purposes of § 10(b), between a domestic "buy order" for securities traded abroad and one party's execution in the U.S. of a swap agreement that references foreign securities.

*B. Applicability of Section 10(b) to Securities–Based Swap Agreements*

It is eminently clear that, as a general matter, § 10(b) applies with equal force to securities and securities-based swap agreements. Although the Exchange Act did not originally contemplate § 10(b) protection for purchasers of derivative instruments such as swaps, Congress expanded the statute in 2000 in order to make explicit that § 10(b), and rules promulgated thereunder to address fraud, manipulation or insider trading, apply to securities-based swap agreements. *See* 147 Cong. Rec. S11, 946–01 (2001) (statement of Sen. Sarbanes).[3] The purpose of the amendment to § 10(b) was to allow "current and future anti-fraud rules [to] apply to swap agreements to the same extent as they do to securities." *Id.; see also SEC v. Rorech*, 720 F.Supp.2d 367, 405 (S.D.N.Y. 2010).

Defendants argue that *Morrison* should bar a claim based on the securities-based swap agreements purchased by Plaintiffs, because Plaintiffs effectively transacted on a foreign exchange when they took short positions through swaps referencing VW shares. Plaintiffs counter that securities-based swap agreements are generally covered by § 10(b), and the swaps at issue here were executed by Plaintiffs in the U.S. and therefore qualify as "domestic transactions in other securities" under the Supreme Court's new transactional test. However, we must consider the economics of the swaps to determine how to apply *Morrison* to securities-based swaps that reference stocks traded abroad. The Supreme Court has routinely emphasized the importance of "economic reality" in determining whether derivative instruments fall within the ambit of federal securities regulations. *See Reves v. Ernst & Young*, 494 U.S. 56, 63 n. 2, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) (The economic reality approach "permits the SEC and courts sufficient flexibility to ensure that those who market investments are not able to escape the coverage of the Securities Acts by creating new instruments that would not be covered by a more determinate definition."); *see also Tcherepnin v. Knight*, 389 U.S. 332,

---

**3.** Indeed, a recent overhaul of the securities laws as part of the Dodd–Frank Financial Wall Street Reform and Consumer Protection Act of 2010 only broadened that part of § 10(b) that extends its reach to "securities-based swap agreements," because Dodd–Frank broadened the meaning of "security-based swap" and redefined "security" under the Exchange Act to include security-based swaps. *See* Dodd–Frank Pub.L. No. 111–203, § 761, 124 Stat. 1376; *see also* 15 U.S.C. § 78j(b) (as amended).

336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (In interpreting the term "security," "form should be disregarded for substance and the emphasis should be on economic reality").[4]

Here, the parties agree that Plaintiffs' swap agreements, which reference VW shares, were economically equivalent to the purchase of VW shares. Plaintiffs even allege that "the swap agreement[s] generated gains as the price of VW shares declined and generated losses as the price of VW shares rose, *achieving an economic result similar to a short sale.*" *See* TAC ¶ 2 n. 2 (emphasis added). Since the economic value of securities-based swap agreements is intrinsically tied to the value of the reference security, the nature of the reference security must play a role in determining whether a transnational swap agreement may be afforded the protection of § 10(b). Here, Plaintiffs' swaps were the functional equivalent of trading the underlying VW shares on a German exchange. Accordingly, the economic reality is that Plaintiffs' swap agreements are essentially "transactions conducted upon foreign exchanges and markets," and not "domestic transactions" that merit the protection of § 10(b). 130 S.Ct. at 2882, 2884.

In *Morrison,* the Supreme Court made clear that the Exchange Act was not intended to "regulat[e] *foreign* securities exchanges." *Id.* at 2884. "The probability of incompatibility with the applicable laws of other countries is so obvious that if

Congress intended such foreign application it would have addressed the subject of conflicts with foreign laws and procedures." *Id.* at 2885. In light of *Morrison's* strong pronouncement that U.S. courts ought not interfere with foreign securities regulation without a clear Congressional mandate, *id.* at 2885–86, I am loathe to create a rule that would make foreign issuers with little relationship to the U.S. subject to suits here simply because a private party in this country entered into a derivatives contract that references the foreign issuer's stock. Such a holding would turn *Morrison's* presumption against extraterritoriality on its head.

■ Here, the swap agreements were transacted with undisclosed counterparties who may well have been located outside the United States. Both the issuer of the reference security, VW, and the perpetrator of the alleged fraud, Porsche, are located in Germany. Although *Morrison* permits a cause of action by a plaintiff who has concluded a "domestic transaction in other securities," this appears to mean "purchases and sales of securities explicitly solicited by the issuer in the U.S.," rather than transactions in foreign-traded securities—or swap agreements that reference them—where only the purchaser is located in the United States. *See Stackhouse v. Toyota Motor Co.,* 2010 WL 3377409 at *1 (C.D.Cal. Jul. 16, 2010). Accordingly, Plaintiffs have failed to state a claim under § 10(b).

---

**4.** Porsche suggests that courts have "consistently looked to the 'material term' referenced in a swap agreement to determine whether § 10(b) applies to a swap-holder's fraud claims." *See* Porsche Moving Mem. 12. While true, the maxim that Porsche cites is only obliquely applicable because it is used in contexts in which courts had to determine whether the derivatives at issue were "securities" within the meaning of the Exchange Act.

*See, e.g., Caiola v. Citibank, N.A., New York,* 295 F.3d 312, 327 (2d Cir.2002) (holding that cash-settled over-the-counter options are securities within the meaning of the Act). By contrast, securities-based swap agreements are clearly within the scope of § 10(b) as amended by the CFMA; the question here is whether *Morrison* bars application of the statute where the reference security is traded abroad.

## IV.  Section 20(a) Claims

■ Control person claims under § 20(a) are "necessarily predicated on a primary violation of securities law." *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir.2004). Because Plaintiffs' primary claims under § 10(b) are dismissed, "these secondary claims must also be dismissed." *Id.; see also Pacific Inv. Management Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir.2010).

## V.  Common Law Fraud Claims

■ Having dismissed the federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3) (permitting courts to decline supplemental jurisdiction where the district court has dismissed all claims over which it has original jurisdiction). Further, for me to determine the merits of Plaintiffs' common law fraud claims would require the Court to analyze German law governing securities fraud, and yet Germany provides for exclusive jurisdiction of securities fraud cases in its own courts, making any judgment from this Court unenforceable in Germany. *See* Wagner Decl. ¶¶ 16–18.

To make the cheese more binding, the German Consulate in New York wrote this Court to inform me of ongoing investigations by German securities regulators into Porsche's accumulation of VW shares, and asked that I consider dismissal on grounds of *forum non conveniens. See* Schnakenberg Letter, Aug. 20, 2010, DiBlasi Reply Decl. Ex. 38. Although I do not base my dismissal of Plaintiffs' common law fraud claims on *forum non conveniens,* the consul's letter and the strong connection of all aspects of this action to Germany provide additional support for my decision to decline to exercise supplemental jurisdiction

over the state law claims asserted in the TAC and the AC.

Moreover, the dismissal is unlikely to prejudice the parties as the litigation is still in its early stages. *See Graham v. Barriger*, 699 F.Supp.2d 612, 637 (S.D.N.Y. 2009) (finding dismissal appropriate "particularly considering that discovery has not commenced and that the federal claims have been dismissed at the pleading stage."). Thus, the Court declines to exercise supplemental jurisdiction, and these claims are dismissed without prejudice.

## VI.  Conclusion

For the foregoing reasons, Counts One, Two, and Three of the Complaints, which allege Exchange Act violations, are dismissed with prejudice. Count Four, which in each Complaint alleges a cause of action for Common Law Fraud, is dismissed in both actions without prejudice. The Clerk of Court is instructed to close these cases and remove them from my docket.

**SO ORDERED.**