*11-397-cv(L)*
*Parkcentral v. Porsche*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2011

(Argued:  February 24, 2012     Decided: August 15, 2014)

Docket Nos. 11-397-cv(L),* 11-403-cv(CON),

11-416-cv(CON),* 11-418-cv(CON), 11-428-cv(CON), 11-447-cv(CON)

─────────────

PARKCENTRAL GLOBAL HUB LIMITED, et al.,
Plaintiffs–Appellants,

v.

PORSCHE AUTOMOBILE HOLDINGS SE, f/k/a DR. ING. H.C. F. PORSCHE
AG, WENDELIN WIEDEKING, HOLGER P. HÄRTER,
Defendants–Appellees.**

─────────────

Before:      LEVAL, SACK, AND HALL, *Circuit Judges*.

Appeal by the plaintiffs from a judgment of the United States District

Court for the Southern District of New York (Harold Baer, Jr., *Judge*) dismissing

the plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  The

district court concluded that the plaintiffs' securities fraud claims, based on their

─────────────

   * The appeals in 11-397-cv(L) and 11-416-cv(CON) were withdrawn by
stipulation on May 15, 2013.
   ** The Clerk of Court is respectfully instructed to amend the caption as set
forth above.

execution of securities-based swap agreements referencing the price of Volkswagen stock trading on foreign exchanges, represented an impermissibly extraterritorial application of United States securities laws.  We agree—although for reasons somewhat different from those set forth by the district court—and conclude that the district court's judgment of dismissal should be affirmed.

AFFIRMED, but REMANDED to permit the district court to consider granting leave to plaintiffs to file one or more amended complaints should one or more motions to that effect be made.

Judge Leval joins in this per curiam opinion and concurs in a separate opinion.

JAMES B. HEATON, III (Kaspar J. Stoffelmayr, *on the brief*), Bartlit Beck Herman Palenchar & Scott LLP, Chicago, IL, David Parker, Kleinberg, Kaplan, Wolff & Cohen P.C., New York, NY, Jay W. Eisenhofer, James J. Sabella, Grant & Eisenhofer P.A., New York, NY, Thomas E. Redburn, Jr., Sheila A. Sadighi, Lowenstein Sandler PC, Roseland, NJ, Marc L. Greenwald, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, *for Plaintiffs–Appellants*.

ROBERT J. GIUFFRA, JR. (John L. Warden, William J. Williams, Jr., Suhana S. Han, Alexander J. Willscher, *on the brief*),

2

Sullivan & Cromwell LLP, New York, NY, *for Defendant–Appellee Porsche Automobil Holding SE.*

Jay B. Kasner, Scott D. Musoff, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, *for Defendant–Appellee Dr. Wendelin Wiedeking.*

Michael J. Chepiga, Paul C. Curnin, Emma Lindsay, Alexandra C. Pitney, Simpson Thacher & Bartlett LLP, New York, NY, *for Defendant–Appellee Holger P. Härter.*

Meredith E. Kotler, Cleary Gottlieb Steen & Hamilton LLP, New York, NY, Giovanni P. Prezioso, Lee F. Berger, Cleary Gottlieb Steen & Hamilton LLP, Washington, DC, *for Amici Curiae Securities Industry and Financial Markets Association and Chamber of Commerce of the United States of America.*

Ira D. Hammerman, Kevin M. Carroll, Securities Industry and Financial Markets Association, Washington, DC, *for Amicus Curiae Securities Industry and Financial Markets Association.*

Robin S. Conrad, Sheldon Gilbert, National Chamber Litigation Center Inc., Washington, DC, *for Amicus Curiae Chamber of Commerce of the United States of America.*

Andrew J. Pincus, Marc R. Cohen, Alex C. Lakatos, Paul W. Hughes, Mayer Brown LLP, Washington, DC, *for Amici Curiae The Federation of German Industries, Mouvement Des Entreprises De France, Economiesuisse, European Banking Federation, Association of*

*German Banks, German Issuers, and The Swiss Bankers Association*.

Richard W. Painter, University of Minnesota Law School, Minneapolis, MN, Ronald J. Colombo, Hofstra University Law School, Hempstead, NY, *for Amici Curiae Law Professors*.

PER CURIAM:

In *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), the Supreme Court established that, by virtue of the presumption against extraterritorial application of U.S. statutes, § 10(b) of the Securities Exchange Act of 1934, the basic antifraud provision of the U.S. securities laws, has no extraterritorial application, and no civil suit under that section may be brought unless predicated on a purchase or sale of a security listed on a domestic exchange or on a domestic purchase or sale of another security. *See id.* at 267 ("And it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies."). In *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), this Court set forth the means to be used to determine when a transaction in securities is "domestic" such that it may furnish the basis for a suit under that section. We concluded that in order for such a transaction to qualify as domestic, "the parties [must]

4

incur irrevocable liability to carry out the transaction within the United States or . . . title [to the securities must be] passed within the United States." *Id.* at 69.

In this case, the securities transactions upon which the plaintiffs brought suit were so-called "securities-based swap agreements" relating to the stock of Volkswagen AG ("VW"), a German corporation; the amount of gain and loss in the transactions depended on prices of VW stock recorded on foreign exchanges. The parties accused of fraud are Porsche Automobil Holding SE ("Porsche"), also a major German corporation, and its executives. Their allegedly fraudulent statements consisted of assertions about Porsche's intentions with respect to the stock of VW; their statements were made primarily in Germany, but were also accessible in the United States and were repeated here by the defendants. The thorny issue presented by this appeal is how to apply the rules established by the *Morrison* and *Absolute Activist* decisions to this case.

The plaintiffs, more than thirty international hedge funds, employed securities-based swap agreements pegged to the price of VW shares, which trade on European stock exchanges, to bet that VW stock would decline in value. The positions they took through their swap agreements were roughly economically equivalent to short positions in VW stock, in that they would gain to the extent

5

VW stock declined in value and would lose to the extent it rose. Plaintiffs allege that, in 2008, defendants made various fraudulent statements and took various manipulative actions to deny and conceal Porsche's intention to take over VW. The plaintiffs allege that they relied on defendants' fraudulent denial of Porsche's intention to take over VW in making their swap agreements. When, in October 2008, Porsche made its true intentions public, the price of VW shares rose dramatically, causing the plaintiffs to suffer large losses.

The plaintiffs brought the instant complaints in the United States District Court for the Southern District of New York against Porsche and two of its corporate officers alleging, among other things, that the defendants' fraudulent statements and manipulative actions violated U.S. securities laws. Following the Supreme Court's decision in *Morrison*, the defendants moved to dismiss the complaint because the plaintiffs' swap agreements referenced securities trading on foreign exchanges. The district court (Harold Baer, Jr., *Judge*) granted the defendants' motion, concluding that the swaps were essentially transactions in securities on foreign exchanges.

We affirm the judgment, although on the basis of different reasoning. In our view, the imposition of liability under § 10(b) on these foreign defendants

with no alleged involvement in plaintiffs' transactions, on the basis of the defendants' largely foreign conduct, for losses incurred by the plaintiffs in securities-based swap agreements based on the price movements of foreign securities would constitute an impermissibly extraterritorial extension of the statute. Our ultimate conclusion that this suit seeks impermissibly to extend § 10(b) extraterritorially depends in some part on the particular character of the unusual security at issue. For reasons explained below, we express no view whether we would have reached the same result if the suit were based on different transactions. Out of an abundance of caution, however, we remand the matter to the district court so that it may consider motions, if any, by one or more of the plaintiffs to amend their complaints in response to our decision on this appeal.

## BACKGROUND

Because this case comes to us on appeal from the district court's grant of the defendants' motion to dismiss, the facts are drawn from the plaintiffs' complaints, "accepting all well-pleaded allegations in the complaint as true and drawing all reasonable inferences in the plaintiff[s'] favor," *Bigio v. Coca–Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012) (internal quotation marks and brackets omitted), and augmented by matters of which we may and do take judicial notice, *see*

7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources . . . , in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("[W]e may consider . . . legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

### Porsche's Alleged Scheme to Acquire VW

Porsche, the well-known German automobile manufacturer, is also an active investor in various securities and derivatives. Indeed, in the fiscal year ending July 31, 2008, the company, under the direction of defendants Chief Executive Officer Wendelin Wiedeking and Chief Financial Officer Holger Härter, derived eighty-eight percent of its total profits from its investments and twelve percent of its total profits from selling motor vehicles.

From late 2005 through 2007, Porsche gradually increased its investment in VW, another well-known German automobile manufacturer, whose shares trade primarily on European exchanges. At the time, a German statute known as the "VW Law" limited any one VW shareholder's voting rights to twenty percent of

the total voting rights, regardless of how many VW shares the shareholder actually owned. In the face of public speculation that the European Court of Justice would soon invalidate the VW Law, Porsche claimed publicly that its acquisition of these shares was intended to prevent a hostile takeover of VW, with which it had important business relationships. Porsche also disavowed any intention to obtain a controlling interest in VW—then defined by the VW Law as eighty percent of the company's outstanding shares, or seventy-five percent of the shares in the event that other stakeholders agreed to vote in favor of a "domination agreement."[1] By the end of 2007, Porsche had become VW's largest shareholder, owning thirty-one percent of the company.

The plaintiffs allege that in spite of its public assurances to the contrary, at least as early as February 2008, Porsche had developed a secret plan to acquire the minimum seventy-five percent interest needed to gain control of VW.[2] Porsche's problem was that VW's stock was held in large part by parties who

[1] Under German law, "[a] domination agreement between an acquiring firm and a target firm allows the acquiring firm to control the target firm's decisions." Third Amended Complaint ¶ 6, *Elliot Assocs., L.P. v. Porsche Automobil Holding SE*, 10 Civ. 532 (S.D.N.Y. July 21, 2010) (the "Elliott Compl.").

[2] According to German press accounts published nearly a year after the fact, representatives of Porsche met with officials from the State of Lower Saxony—which held approximately twenty percent of VW's stock—in February 2008, and informed them of this plan.

9

either did not want to, or could not for political or other reasons, sell it.  As a result, VW's "float"—the amount of shares available to the public for trading—was insufficient to allow Porsche to acquire a seventy-five percent stake outright.  But if those shareholders unwilling to sell could nevertheless be induced to *lend* their shares to third parties engaged in short sales of VW stock, the shares would temporarily enter the market, giving Porsche the opportunity to buy them.[3]  This became the core of Porsche's strategy.

The plaintiffs allege that Porsche induced them to bet on a decline in the price of VW shares, Third Amended Complaint ¶ 5, *Elliot Assocs., L.P. v. Porsche*

---

[3]

> Short selling is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest. . . .  The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares [at a later date]. . . . [T]he short seller [typically] makes this covering purchase using the funds he received from selling the borrowed stock.  Herein lies the short seller's potential for profit:  if the price of the stock declines after the short sale, he does not need all the funds to make his covering purchase; the short seller then pockets the difference.  On the other hand, there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to a stock's price, there is no limitation on the short seller's risk. . . .  "Selling short," therefore, actually involves two separate transactions:  the short sale itself and the subsequent covering purchase.

*Zlotnick v. TIE Commc'ns*, 836 F.2d 818, 820 (3d Cir. 1988).

*Automobil Holding SE*, 10 Civ. 532 (S.D.N.Y. July 21, 2010) (the "Elliott Compl."), principally by "express[ly] den[ying] that it would take over VW in the near future," and thus making VW's shares "appear[] increasingly overvalued relative to the shares of other publicly traded automobile companies," *id.* ¶ 2. The plaintiffs allege that, by concealing its intention to acquire control of VW, Porsche led them to conclude erroneously that the demand for VW stock was lower than it actually was. For these and other reasons, the plaintiffs then entered into various short-sale transactions involving VW stock and into securities-based swap agreements economically equivalent to short sales of VW stock—standing to gain if VW share price fell, and to lose if it rose.

To tap into the market for VW shares offered by short-sellers such as the plaintiffs, Porsche purchased call options. These gave Porsche the right to buy VW shares at a specified future date and price.[4] To hedge against Porsche's exercise of its option rights, its call option counterparties bought and held the

_____

[4]
> An option . . . is a purchased right to buy or sell property at a fixed or floating price. If not exercised within the contractually-specified period, an option expires and the buyer of the option loses the acquisition price. A call option gives the option holder the right to buy shares of an underlying security at a particular price . . . .

*Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 321 n.2 (2d Cir. 1998) (citation omitted).

VW shares that short-sellers had sold into the market. The plaintiffs allege that Porsche took various steps to conceal its acquisition of call rights, including buying a sufficiently small number of call options from each of many counterparties so that no one counterparty would acquire enough VW stock for hedging purposes as to trigger legal disclosure requirements.

Throughout this period, Porsche made repeated public statements disclaiming any intention to acquire a controlling share of VW, and denying that it was trying to obtain a seventy-five percent stake. The plaintiffs' investment managers—located in New York City and elsewhere in the United States— concluded, based on the publicly available information, that Porsche was unable or unwilling to acquire control of VW. Because Porsche's strategy had avoided triggering counterparty disclosures, the investment managers remained unaware that Porsche could at any moment exercise rights to purchase large numbers of VW shares.

*The October 2008 Short-Squeeze*

Porsche financed its purchase of call options by selling put options on VW stock. These options obligated Porsche to pay its counterparties the difference between a pre-set "strike" price and the actual price of VW stock if the actual

12

price fell below the strike price.[5] While revenue from its sale of put options allowed Porsche to covertly fund its purchase of call options, the strategy also carried risks. If the price of VW stock fell, the difference between the share price and the strike price would increase, exposing Porsche to potentially massive liability. Indeed, Porsche had entered into so many of these contracts that it risked insolvency in the event VW stock price fell precipitously.

Through the first three quarters of 2008, VW's share price continued to rise and Porsche's strategy proceeded as planned. As the global financial crisis became increasingly serious in late October 2008, however, VW's stock price began a sharp decline. By October 24, 2008, the price had fallen thirty-nine percent from its average closing price between October 1 and October 17, 2008. As a result, Porsche's liability to its put option counterparties grew dramatically.

---

[5] "A put option is the right to sell a security at a specified price; thus, the value of a put option increases as the price of the underlying security falls." *Magma Power Co.*, 136 F.3d at 321 n.2. Because Porsche was the seller of put options, the amount Porsche owed to its counterparties increased as the value of VW stock fell. And the plaintiffs allege that unlike Porsche's call options, which entitled Porsche to purchase actual shares, its put options were "cash-settled," meaning only a cash payment changed hands. "Although in theory an option contract is to be settled by the purchase or sale of the optioned security in accordance with the rights created by the option contract, in practice settlement is generally effectuated by a cash payment representing the difference between the market price and the strike price." *Dow Jones & Co. v. Int'l Secs. Exch.*, 451 F.3d 295, 298 (2d Cir. 2006).

The plaintiffs allege that, in a bid to shore up VW's share price and avert disaster, Porsche finally decided to disclose its theretofore secret plan to the public. On Sunday, October 26, 2008, the company issued a press release entitled "Porsche Heads for Domination Agreement," revealing that Porsche had acquired 74.1 percent of VW through a combination of direct holdings and call options. Complaint ¶ 66, *Viking Global Equities LP v. Porsche Automobil Holdings SE*, 10 Civ. 8073 (S.D.N.Y. Oct. 22, 2010) ("Viking Compl."). The release explained that Porsche hoped to "increase [its VW stake] to 75% in 2009, paving the way to a domination agreement." *Id.* And it stated that the disclosure of the actual extent of Porsche's ownership of VW "should give so called short sellers . . . the opportunity to settle their relevant positions without rush and without facing major risks." *Id.*

The irony of that statement may have been unintentional, but on the following day, "all hell broke loose." Viking Compl. ¶ 67 (quoting Mike Esterl and Edward Taylor, *As Giant Rivals Stall, Porsche Engineers a Financial Windfall*, Wall St. J., Nov. 8, 2008, at A1). With Porsche holding 74.1 percent of VW's shares, and the German State of Lower Saxony holding another twenty percent, just 5.9% of the company's outstanding shares remained theoretically available

14

for purchase. Short-sellers obligated to acquire and return nearly thirteen percent of VW's outstanding shares to the parties from whom they had borrowed them found themselves facing a severe shortage. Compounding the problem, a substantial proportion of the 5.9 percent in the float was held by index funds that would not or could not sell some or all of their shares.

As the market absorbed the news of Porsche's takeover plan, the price of VW stock began to skyrocket, leaving short-sellers scrambling to purchase the shares they needed to unwind their short sales and limit their losses. That flurry of activity caused the price of VW stock to rise even more rapidly, further increasing the short-sellers' losses and increasing their desperation to buy shares. This vicious cycle—a "short squeeze"—led the price of VW stock to nearly quintuple from its price during the preceding week. Indeed, for several hours, VW became the most valuable corporation in the world measured by market capitalization. To satisfy some of this demand, Porsche agreed to release five percent of its holdings, obtaining a huge windfall as a result.

When the dust had settled, parties with short positions in VW had lost an estimated total of $38.1 billion, and VW's share price had fallen back to roughly

2007 levels. German authorities later investigated Porsche and its executives, including Wiedeking and Härter, in connection with these events.

### *The Plaintiffs' Securities-based Swap Agreements*

The transactions in which plaintiffs incurred the losses that are the subject of this suit were synthetic investments, known as securities-based swap agreements.[6] These investments were economically equivalent to short sales referencing VW shares.

A securities-based swap agreement is a private contract between two parties in which they "agree to exchange cash flows that depend on the price of a reference security, here VW shares." Elliot Compl. ¶ 2 n.2; *see also* Don M. Chance, Essays in Derivatives 43 (1998) ("An equity swap is an agreement between two parties for each to make to the other a series of payments in which at least one party's payments [are] based on the return on a stock or index."). The U.S. securities laws in effect at the time of the events at issue defined such a swap as "a swap agreement . . . of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or

---

[6] The securities laws use the term "security-based swap agreement" in 15 U.S.C. § 78c, but use the term "securities-based swap agreement" in 15 U.S.C. § 78j(b). Because this opinion focuses on § 10(b), we use the latter term throughout this opinion.

any interest therein." *SEC v. Rorech*, 720 F. Supp. 2d 367, 404 (S.D.N.Y. 2010) (quoting section 206B of the Gramm–Leach–Bliley Act, Pub. L. No. 106–102, 113 Stat. 1338 (1999), *amended by* Pub. L. No. 106-554, § 301(a), 114 Stat. 2763, 2763A-451 (2000) (hereafter "Gramm–Leach–Bliley Act")).[7]

A securities-based swap agreement is a separate and distinct financial instrument from the security it references. *See* Gramm–Leach–Bliley Act, § 206A. Securities-based swap agreements are designed to roughly replicate the

---

[7]

> The Dodd-Frank Act amended the Commodity Exchange Act (CEA) and the Securities Exchange Act of 1934 (Exchange Act) to provide statutory definitions for the terms swap, security-based swap, mixed swap and security-based swap agreement. As amended, the CEA defines swaps broadly to include "any agreement . . . that provides on an executory basis for the exchange . . . of 1 or more payments based on the value or level of 1 or more . . . rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind . . . and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred." This broad statutory definition is subject to numerous exclusions.

Mark D. Young, et al., *"CFTC and SEC Adopt Rules Defining 'Swap' and 'Security-Based Swap'"* (Aug. 15, 2012), *available at* http://www.skadden.com/insights/cftc-and-sec-adopt-rules-defining-swap-and-security-based-swap (last visited Aug. 7, 2014) (footnotes omitted).

economic effect of owning the referenced share of stock for one counterparty, and shorting the referenced share of stock for the other counterparty, without either party taking an actual ownership interest in the reference security. The plaintiffs allege that because they took the "short" side of these synthetic investments, "the swap agreement[s] [would] generate[] gains as the price of VW shares declined and [would] generate[] losses as the price of VW shares rose, achieving an economic result similar to a short sale." Elliot Compl. ¶ 2 n.2.

Because securities-based swap agreements do not involve the actual ownership, purchase, or sale of the reference security, the securities laws describe swaps as transactions in which the counterparties agree to make certain transfers "without also conveying a current or future direct or indirect ownership interest." Gramm-Leach-Bliley Act § 206A. Instead, the parties agree to exchange payments calculated by applying the change in price of the reference security—in this case, VW shares—to a pre-determined "notional amount" set by the parties. The parties are free to select any notional amount they choose, regardless of the number of shares actually trading in the reference security.[8]

---

[8] This feature of swap agreements facilitates the ability of swap investors to wager on the value of a stock in quantities that are unrelated to the amount of stock available. Amici have argued that this multiplier effect could impose

18

Thus, as bilateral agreements to pay money on the occurrence or nonoccurrence of wholly independent events, securities-based swap agreements are essentially wagers on changes in the price of the reference securities.

Although securities-based swap agreements are, in the ways just discussed, different from transactions in many other, less exotic securities, which involve actual transfer of shares, they also share some features with other types of securities. For example, a cash-settled option, like these swap agreements, gives the right to payments based on future change in the value of the stock it references, rather than any right or obligation to delivery of the stock itself. *See Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 324-27 (2d Cir. 2002) (discussing cash-settled options).

---

liability beyond the appropriate limits of § 10(b). *See* Br. of Amicus Curiae Law Professors at 28 ("Swap traders, for example could enter into billions of dollars of swaps referencing the value of stock in a corporation owning a single coffee shop off Wall Street if they wanted to."). Their argument highlights a matter that we do not decide today: whether a party to even a domestic securities-based swap agreement may, on that basis alone, have statutory standing to sue a non-counterparty who merely functioned as an issuer of or trader in the securities referenced by the swap. That question, which concerns the scope of § 10(b)'s requirement of deceptive conduct "in connection with the purchase or sale" of a security or securities-based swap agreement, is not before this Court. *See* 15 U.S.C. § 78j(b).

*Geography of the Dispute*

Inasmuch as this appeal involves the applicability of the securities laws to claims involving foreign elements, the location of certain key events, entities, and instruments is essential to our analysis.

The plaintiffs have, to varying degrees, alleged that they entered into the swap agreements referencing VW shares in the United States. Some of the plaintiffs allege that their investment managers "took all steps necessary to transact the securities-based swap agreements" from their offices in New York City. *E.g.*, Elliott Compl. ¶ 149. Others allege that their investment managers "signed a confirmation required by [the] . . . swap counterparty in" New York City. *Id.* ¶ 151. Still others allege more specifically that their "swap transactions were entered into, terminated, and based entirely in the United States, with Deutsche Bank in New York acting as the counterparty," Complaint ¶ 3, *Parkcentral Global Hub Ltd. v. Porsche Automobil Holdings SE*, No. 10 Civ. 8074 (S.D.N.Y. Oct. 22, 2010), or that their swap agreements were "entered into with New York-based Morgan Stanley in the United States," Complaint ¶ 2, *Bluemountain Equity Alternatives Master Fund L.P. v. Porsche Automobil Holding SE*, No. 10 Civ. 8084 (S.D.N.Y. Oct. 25, 2010), or that their "counterparties were acting on behalf of financial institutions located in New York," Complaint ¶ 39, *Black*

20

*Diamond Offshore Ltd. v. Porsche Automobil Holding SE*, No. 10 Civ. 4155 (S.D.N.Y. July 23, 2010) ("Black Diamond Compl."). The swap agreements contained New York choice-of-law provisions and forum selection clauses designating New York federal and state courts as the forum in which legal disputes would be heard. *See, e.g.*, Elliott Compl. ¶ 149. The plaintiffs do not allege, however, that Porsche was a party to any securities-based swap agreements referencing VW stock, or that it participated in the market for such swaps in any way.

Although the securities-based swap agreements in this case may have been concluded domestically, the VW shares they referenced appear to trade only on foreign exchanges. VW shares trade on the Frankfurt Stock Exchange and "international stock exchanges in Switzerland, Luxembourg, and the UK." Complaint ¶ 36, *Seneca Capital LP v. Porsche Automobil Holdings SE*, No. 10 Civ. 8161 (S.D.N.Y. Oct. 27, 2010). The plaintiffs do not allege that they are traded on any United States exchange.[9]

---

[9] VW had two sponsored, unlisted American depositary receipt ("ADR") programs based in New York. An ADR is an instrument that represents a specified amount of a foreign security that has been deposited with a foreign branch or agent of the depositary, known as the custodian. The holder of an ADR is not the title owner of the underlying shares. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3d Cir. 2002) (citations to Bruce L. Hertz, *American Depository*

21

Porsche's allegedly deceptive conduct occurred primarily in Germany, although the plaintiffs allege that some of Porsche's statements denying any intention to acquire control of VW were made into the United States or were available here. *See, e.g.*, Viking Compl. ¶ 44 (listing statements made to investment managers in New York or to German and international media); Elliot Compl. ¶¶ 83–85 (listing statements plaintiffs "believe" Porsche directed into the United States, and that Porsche executives either made in telephone calls or on visits to the United States). As stated, German authorities undertook to investigate Porsche and its executives in relation to these events.

***District Court Proceedings***

On January 25, 2010, the plaintiffs filed the complaint in *Elliott Associates L.P. v. Porsche Automobil Holding SE*, No. 10 Civ. 532 ("*Elliott*"), in the United States District Court for the Southern District of New York, alleging violations of the federal securities laws and common law fraud. The plaintiffs claimed that Porsche, Wiedeking, and Härter lied about Porsche's intent to take over VW and hid the extent of Porsche's control of VW from the market through manipulative

---

*Receipts*, 600 P.L.I./Comm. 237 (1992), omitted). Nothing in the record before us suggests that swap counterparties could not designate an ADR rather than the security linked to the ADR as a swap's reference security if they wished. They did not, however, do so in this case.

options trades. In June 2010, *Elliott* was consolidated before Judge Baer with another case "involving substantially the same allegations" filed May 20, 2010, *Black Diamond Offshore Ltd. v. Porsche Automobile Holding SE*, No. 10 Civ. 4155 ("*Black Diamond*"). *See Elliott Assocs. v. Porsche Automobil Holding SE*, 759 F. Supp. 2d 469, 470 (S.D.N.Y. 2010). Following two amendments to the *Elliott* complaint, the Supreme Court decided *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). The parties agreed that a further amendment to each complaint would be necessary in light of that decision. The Third Amended Complaint in *Elliott* and the Amended Complaint in *Black Diamond* were filed on July 21 and July 23, 2010, respectively.

The defendants moved to dismiss both complaints pursuant to Federal Rule of Civil Procedure 12(b)(6) based principally on *Morrison*. Before the motions were fully submitted, four related actions were filed in the Southern District against the defendants arising out of the same operative facts—*Viking Global Equities LP v. Porsche Automobil Holdings SE*, No. 10 Civ. 8073; *Parkcentral Global Hub Ltd. v. Porsche Automobil Holdings SE*, No. 10 Civ. 8074; *Bluemountain Equity Alternatives Master Fund L.P. v. Porsche Automobil Holding SE*, No. 10 Civ. 8084; and *Seneca Capital LP v. Porsche Automobil Holdings SE*, No. 10 Civ. 8161. By

23

stipulation of the parties in all six actions, it was agreed that the district court's ruling on the pending motions to dismiss in *Elliott* and *Black Diamond* would "apply in the New Actions, . . . as if the Court had issued those rulings in the New Actions." *Elliott Assocs.*, 759 F. Supp. 2d at 470 n.1.

On December 30, 2010, the district court granted the defendants' motion to dismiss the plaintiffs' federal law claims with prejudice, and declined to exercise supplemental jurisdiction over the plaintiffs' common law claims. The plaintiffs filed this timely appeal.

**DISCUSSION**

"We review *de novo* a district court's dismissal of a complaint under Rule 12(b)(6), accepting all of the complaint's factual allegations as true and drawing all reasonable inferences in the plaintiffs' favor." *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012). The complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is appropriate when "it is clear from the face of the complaint, and matters of

24

which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000).

## I. Liability for Foreign Conduct Under the Federal Securities Laws

### A. The Antifraud Provision of the Exchange Act

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful "[t]o use or employ, in connection with the purchase or sale of *any security . . . or any securities-based swap agreement*[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (footnote omitted; emphasis added). Rule 10b–5, promulgated by the Commission pursuant to § 10(b), provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

25

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. "The underlying purpose of Section 10(b) is to remedy deceptive and manipulative conduct with the potential to harm the public interest or the interests of investors." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) ("*Morrison Ct. App.*") (internal quotation marks omitted), *abrogated in part on other grounds*, *aff'd on other grounds*, 561 U.S. 247 (2010) ("*Morrison*").[10]

### B. *Applicability in Cases Involving Extraterritorial Conduct:* Morrison *and* Absolute Activist

*Morrison* and *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012) ("*Absolute Activist*"), comprise the principal case authority in this Circuit governing the application of § 10(b) and Rule 10b-5 to claims involving extraterritorial conduct.

---

[10] The securities laws insofar as they affect securities-based swaps and securities-based swap agreements have been amended since 2010. Although these amendments, if applicable to the case at bar would not, so far as we can tell, affect the analysis here, they are unlikely to be applicable because the facts in issue occurred before the amendments became effective. *See Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 327 (2d Cir. 2002) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994))).

*1. Morrison.* In the Supreme Court's 2010 opinion in *Morrison*, the plaintiffs alleged that National Australia Bank ("NAB"), an Australian corporation, misrepresented the value of assets held by one of its U.S. subsidiaries. Its allegedly fraudulent valuations had originated in the statements of the U.S. subsidiary. *Morrison*, 561 U.S. at 251–53. The plaintiffs, Australian nationals who had purchased shares of NAB on Australian exchanges, brought an action against NAB in the Southern District of New York alleging violations of § 10(b) and Rule 10b-5. *Id.* at 252–53. NAB moved to dismiss the complaint. Applying the so-called "conduct-and-effects test," the district court granted the motion. We affirmed because "[t]he acts performed in the United States did not 'comprise the heart of the alleged fraud.'" *Id.* at 253 (quoting *Morrison Ct. App.*, 547 F.3d at 175-76) (brackets omitted).

The Supreme Court began by asserting the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison*, 561 U.S. at 255 (internal quotation marks omitted) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*")). This "canon of [statutory] construction," which the Court had previously labeled "the

presumption against extraterritoriality," *see Aramco*, 499 U.S. at 248, is based on the assumption that "Congress ordinarily legislates with respect to domestic, not foreign matters." *Morrison*, 561 U.S. at 255. Under this presumption, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Id*. Applying the presumption to § 10(b), the Court observed that "[o]n its face, § 10(b) contains nothing to suggest it applies abroad." *Id.* at 262. Nor did the statute's "general reference to foreign commerce in the definition of 'interstate commerce' . . . defeat the presumption against extraterritoriality." *Id.* at 263. Thus finding "no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially," the Court "conclude[d] that it does not." *Id.* at 265.

The Court criticized our Circuit's use of the conduct-and-effects test for its disregard of the presumption against extraterritoriality, further criticizing the test as unpredictable and difficult to administer. *Id.* at 257-59. Rejection of the conduct-and-effects test did not end the inquiry. The Court acknowledged that the "presumption here (as often) [was] not self-evidently dispositive, [and] its application require[d] further analysis." *Id.* at 266. In response to the plaintiffs' emphasis on the fact that NAB's allegedly false statements had originated in the United States, the Court observed that it would be "a rare case of prohibited

28

extraterritorial application that lacks *all* contact with the territory of the United States," and added that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Id.* (emphasis in original). The Court went on to consider what it referred to as the "'focus' of congressional concern" expressed by the statute. *Id.* (quoting *Aramco*, 499 U.S. at 255).

> [T]he focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." 15 U.S.C. § 78j(b). Those purchase-and-sale transactions are the objects of the statute's solicitude. . . . *[I]t is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies.*

*Morrison*, 561 U.S. at 266–67 (citation omitted; emphasis added). "With regard to securities *not* registered on domestic exchanges," the Court concluded, the statute's "exclusive focus [is] on *domestic* purchases and sales." *Id.* at 268 (emphases in original). "Not deception alone, but deception with respect to certain purchases or sales is necessary for a violation of the statute." *Id.* at 272.

The Court also "reject[ed] the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad" because

29

"[t]he probability of incompatibility with the applicable laws of other countries is so obvious that if Congress intended such foreign application 'it would have addressed the subject of conflicts with foreign laws and procedures.'" *Id.* at 269 (quoting *Aramco*, 499 U.S. at 256). The Court observed that securities "regulation[s] of other countries often differ[] from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, . . . and many other matters." *Id.* And it predicted that "[t]he transactional test we have adopted—whether the purchase or sale is made in the United States, or involves a security listed on a domestic exchange"—would avoid "the interference with foreign securities regulation that application of § 10(b) abroad would produce." *Id.* at 269–70.

Under *Morrison*, then, "[s]ection 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."[11] *Id.* at 273. Because that case "involve[d] no

---

[11] In response to *Morrison*, Congress amended the securities acts to provide that [t]he district courts of the United States . . . shall have jurisdiction of an action or proceeding brought or instituted by the Commission or the United States alleging a violation of the antifraud provisions of this chapter involving— (1) conduct within the United States that

securities listed on a domestic exchange, and all aspects of the purchases complained of by [the plaintiffs] . . . occurred outside the United States," the Court affirmed the dismissal of the complaint. *Id.*

2. Absolute Activist. After *Morrison*, but while the instant appeal was pending, this Court decided *Absolute Activist*. That appeal required us to "determine under what circumstances the purchase or sale of a security that is not listed on a domestic exchange should be considered 'domestic' within the meaning of *Morrison*." *Absolute Activist*, 677 F.3d at 66-67. The plaintiffs, nine Cayman Islands-based hedge funds, bought shares in companies incorporated in the United States, whose shares traded only over-the-counter, directly from those companies. *Id.* at 63. The district court dismissed the complaint on the grounds

---

constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States.

15 U.S.C. § 78aa(b); *id.* § 77v(c) (extending jurisdiction of suits brought under § 17(a) of the Securities Act of 1933 in the same fashion). The import of this amendment is unclear, however, because *Morrison* itself explicitly held that the Court there had jurisdiction to decide the case under the version of § 78aa then in force, even if the presumption against extraterritoriality meant that the plaintiffs failed on the merits. *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 253–54 (2010).

that the allegations, including the foreign identity of the purchasers, did not state a domestic claim in light of *Morrison*. *Id.* at 65.

On appeal, we concluded that "a securities transaction is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States." *Id.* at 69. Therefore,

> in order to adequately allege the existence of a domestic transaction [under *Morrison*], it is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States: that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security.

*Id.* at 68. Alternatively, we held that "it is sufficient for the plaintiff to allege that title to the shares was transferred within the United States." *Id.* (citing and quoting *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310-11 (11th Cir. 2011)).

Because the complaint in *Absolute Activist* contained only conclusory allegations as to where liability became irrevocable or title changed hands, we remanded with instructions to the district court to allow the plaintiffs leave to amend. *Id.* at 69-71.

In reaching these conclusions, we rejected the plaintiffs' argument that "the identity of the securities should be used to determine whether a securities transaction is domestic and that where, as in th[at] case, the securities [were] issued by United States companies and [were] registered with the SEC, the transactions [were] domestic within the meaning of *Morrison*." *Id.* at 68. That argument was "belied by the wording of the test announced in *Morrison*" because "[t]he second prong of that test refers to 'domestic transactions in other securities,' not 'transactions in domestic securities' or 'transactions in securities that are registered with the SEC.'" *Id.* at 68-69 (citation omitted). We could not therefore "conclude that the identity of the security necessarily has any bearing on whether a purchase or sale is domestic within the meaning of *Morrison*." *Id.* at 69.

We also rejected proposed tests that would have looked to the identity of the buyer and seller, the identity of the broker, or whether, in addition to a domestic transaction, some fraudulent acts occurred in the United States, reasoning that "the transactional test announced in *Morrison* does not require that each defendant alleged to be involved in a fraudulent scheme engage in conduct in the United States." *Id.* at 68-69.

**II.** **The District Court's Application of *Morrison* and the Arguments on Appeal**

As explained in the "Background" section of this opinion, the claims of the operative complaints were based only on the plaintiffs' securities-based swap agreements referencing VW shares. The defendants moved to dismiss, arguing that *Morrison* precluded an action based on securities-based swap agreements referencing foreign shares, even if the swap agreements themselves were—as the plaintiffs alleged—concluded in the United States.

The district court agreed with the defendants. It rejected the plaintiffs' contention that "whether § 10(b) applies to a transaction depends *only* on where the transaction occurs" as a "narrow reading of *Morrison*." *Elliott Assocs.*, 759 F. Supp. 2d at 474 (emphasis in original). The court turned instead to what it considered the *Morrison* Court's principal concern—"avoid[ing] 'interference with foreign securities regulation that application of § 10(b) abroad would produce.'" *Id.* (quoting *Morrison*, 561 U.S. at 269). It concluded that it would "contravene the intention of the Supreme Court in *Morrison*" to "extend extraterritorial application of the Exchange Act's antifraud provisions to virtually any situation in which one party to a swap agreement is located in the United States." *Id.* Indeed, "[s]uch a holding would turn *Morrison*'s presumption

34

against extraterritoriality on its head," especially when "[b]oth the issuer of the reference security, VW, and the perpetrator of the alleged fraud, Porsche, are located in Germany." *Id.* at 476.

To reconcile *Morrison*'s instructions with its understanding of the Court's desire to avoid interference with foreign regulation, the district court reasoned that "we must consider the economics of the swaps to determine how to apply *Morrison* to securities-based swaps that reference stocks traded abroad." *Id.* at 475. "Since the economic value of securities-based swap agreements is intrinsically tied to the value of the reference security, the nature of the reference security must play a role in determining whether a transnational swap agreement may be afforded the protection of § 10(b)." *Id.* at 476. Because the "[p]laintiffs' swaps were the functional equivalent of trading the underlying VW shares on a German exchange[,] . . . the economic reality is that [the swaps] are essentially 'transactions conducted upon foreign exchanges and markets,' and not 'domestic transactions' that merit the protection of § 10(b)." *Id.* (quoting *Morrison*, 561 U.S. at 263, 267). Based on this understanding of securities-based swap agreements, the court concluded that

> [a]lthough *Morrison* permits a cause of action by a plaintiff who has
> concluded a "domestic transaction in other securities," this appears

to mean "purchases and sales of securities explicitly solicited by the issuer in the U.S.," rather than transactions in foreign-traded securities—or swap agreements that reference them—where only the purchaser is located in the United States.

*Id.*

Accordingly, the district court granted the defendants' motion to dismiss the § 10(b) claims, as well as the subsidiary § 20(a) claims against Wiedeking and Härter. *Id.* at 476-77. It declined to exercise supplemental jurisdiction over the plaintiffs' common law fraud claims. *Id.* at 477.

On appeal, the plaintiffs urge us to reject the district court's functional approach to analyzing swaps. They argue that "[b]ecause § 10(b) applies with equal force to securities and securities-based swap agreements," Pls.' Br. 20 (citing 15 U.S.C. § 78j(b)), "[u]nder *Morrison*, § 10(b) reaches transactions in securities-based swap agreements within the territorial United States," *id.* at 21. Because the "[p]laintiffs pleaded that they transacted within the territorial United States in securities-based swap agreements[,] . . . §10(b) protects plaintiffs' transactions." *Id.* at 21-22. "After *Morrison*, it is that simple." Pls.' Reply Br. 4.

Porsche counters that "[b]ecause Section 10(b), by its terms, applies to swaps 'to the same extent' as to securities," the swaps were not covered by § 10(b) because the "shares [referenced by the swaps] clearly were not covered."

36

Porsche Br. 4-5.  It argues that "Congress sought through the [Commodity Futures Modernization Act of 2000 (the "CFMA"), Pub. L. No. 106–554, 114 Stat. 2763 (2000)] to treat security-based swaps *the same as* direct stock purchases and sales [of the reference security] to which the swaps are 'functionally' equivalent." *Id.* at 28 (emphasis in original).  "Absent [a] clear [expression of congressional] intent [to the contrary], the Court must presume that Congress intended for Section 10(b) to apply only to [swap agreements] that reference U.S.-traded securities.  To do otherwise would create greater protection for transactions in swaps referencing foreign-traded securities than for transactions in the underlying securities those swaps reference." *Id.* at 31.  And Porsche warns that the plaintiffs' proposed rule would cause interference with foreign securities markets and the securities regulations of foreign sovereigns, such as Germany. "[F]oreign issuers all over the world could be subjected to Section 10(b) claims in a U.S. court, no matter where their shares trade and regardless of their adherence to their own local law, simply by virtue of a private contract entered into between private parties without the issuers' (or, here, a market participant's) control or even knowledge." *Id.* at 33-34.

### III.   Analysis

As a matter of first principles, the Supreme Court has said that it is "acutely aware . . . that [it] sit[s] to decide concrete cases and not abstract propositions of law" and has therefore "decline[d] to lay down . . . broad rule[s] . . . to govern all conceivable future questions in [an] area." *Upjohn Co. v. United States*, 449 U.S. 383, 386 (1981); *see also New York v. United States*, 326 U.S. 572, 575 (1946) ("One of the greatest sources of strength of our law is that it adjudicates concrete cases and does not pronounce principles in the abstract."); *United States v. Blackburn*, 461 F.3d 259, 262 n.2 (2d Cir. 2006) (stating that we are "empowered to decide concrete cases and not abstract principles").  One of the principal "distinction[s] between courts and legislatures [is that] the former usually act retrospectively, settling disputes between persons, [while] the latter usually act prospectively, setting the general rules for future conduct." *Simmons v. Lockhart*, 931 F.2d 1226, 1230 (8th Cir. 1991).

We are of course bound by *Morrison* and *Absolute Activist* in determining whether § 10(b), and Rule 10b-5 promulgated by the Securities and Exchange Commission pursuant thereto, applies to the defendants' alleged conduct.  We must proceed cautiously in applying teachings the *Morrison* Court developed in a case involving conventional purchases and sales of stock to derivative securities,

38

like securities-based swap agreements, that vest parties with rights to payments based on changes in the value of a stock.

A question of potentially determinative importance for this case is whether, under *Morrison*, a domestic transaction in a security (or a transaction in a domestically listed security)—in addition to being a *necessary* element of a domestic § 10(b) claim—is also *sufficient* to make a particular invocation of § 10(b) appropriately domestic. If a domestic transaction in a security is not only necessary but also sufficient to justify the application of § 10(b) to otherwise foreign facts, and the plaintiffs' securities-based swap agreements (which we assume for these purposes were executed and performed in the United States) are deemed domestic transactions under *Absolute Activist*, then all other questions would drop away. The mere fact that the plaintiffs based their suit on a domestic transaction would make § 10(b) applicable to allegedly fraudulent conduct anywhere in the world. In such a case, these complaints would properly invoke a domestic application of § 10(b).

*Morrison* established two important rules about the applicability of § 10(b). First, *Morrison* held that, because Congress did not indicate an intention that § 10(b) should apply extraterritorially, the presumption against extraterritoriality

dictates that § 10(b) has no extraterritorial application. *Morrison*, 561 U.S. at 265.

Second, *Morrison* ruled that § 10(b) does not apply unless the suit is predicated on either a domestic securities transaction or a transaction in a domestically listed security. *Id.* at 267. Because neither was present in the case before it, the Court held that the invocation of § 10(b) was impermissibly extraterritorial, and the complaint failed to state a valid claim.

On careful consideration of *Morrison*'s words and arguments as applied to the facts of this case, we conclude that, while that case unmistakably made a domestic securities transaction (or transaction in a domestically listed security) necessary to a properly domestic invocation of § 10(b), such a transaction is not alone sufficient to state a properly domestic claim under the statute. We reach this conclusion for several reasons.

First, and most important, the Court did not *say* that such a transaction was sufficient to make the statute applicable. The language the Court used was consistent with the description of necessary elements rather than sufficient conditions. *See id.* at 267 ("And it is in our view *only* transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies." (emphasis added)). The Court never said that an

40

application of § 10(b) *will* be deemed domestic *whenever* such a transaction is present.

Second, a rule making the statute applicable whenever the plaintiff's suit is predicated on a domestic transaction, regardless of the foreignness of the facts constituting the defendant's alleged violation, would seriously undermine *Morrison*'s insistence that § 10(b) has no extraterritorial application. It would require courts to apply the statute to wholly foreign activity clearly subject to regulation by foreign authorities solely because a plaintiff in the United States made a domestic transaction, even if the foreign defendants were completely unaware of it. Such a rule would inevitably place § 10(b) in conflict with the regulatory laws of other nations.

The principal reason that the Court "reject[ed] the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad," *id.* at 269, was not that Congress lacked the power to do so. Indeed, the Court implied the contrary. *See id.* at 255 (explaining that the presumption is not a "limit upon Congress's power to legislate"). But "[t]he probability of incompatibility with the applicable laws of other countries [in the case of transfers of shares of common stock] is so obvious that if Congress intended such

41

foreign application it would have addressed the subject of conflicts with foreign laws and procedures" in the statute. *Id.* at 269 (citation and internal quotation marks omitted). The Court apparently thought that, if an extraterritorial application of federal law would likely be incompatible with foreign law, and that application was intended by Congress, Congress would have addressed the conflict. The corollary of that proposition is that if an application of the law would obviously be incompatible with foreign regulation, and Congress has *not* addressed that conflict, the application is one which Congress did not intend.

Applying that axiom to this case illustrates the problem with treating the location of a transaction as the definitive factor in the extraterritoriality inquiry. If the domestic execution of the plaintiffs' agreements could alone suffice to invoke § 10(b) liability with respect to the defendants' alleged conduct *in this case*, then it would subject to U.S. securities laws conduct that occurred in a foreign country, concerning securities in a foreign company, traded entirely on foreign exchanges, in the absence of any congressional provision addressing the incompatibility of U.S. and foreign law nearly certain to arise. That is a result *Morrison* plainly did not contemplate and that the Court's reasoning does not, we think, permit.

42

For all these reasons, we conclude that, while a domestic transaction or listing is *necessary* to state a claim under § 10(b), a finding that these transactions were domestic would not *suffice* to compel the conclusion that the plaintiffs' invocation of § 10(b) was appropriately domestic.[12]

* * *

Because, in the case of securities not listed on domestic exchanges, a domestic transaction is necessary but not necessarily sufficient to make § 10(b) applicable, we need not decide whether the plaintiffs' transactions satisfy the standards of *Absolute Activist* for domestic transactions, because we think it clear that the claims in this case are so predominantly foreign as to be impermissibly extraterritorial.

To begin with, the application of § 10(b) to the defendants would so obviously implicate the incompatibility of U.S. and foreign laws that Congress could not have intended it *sub silentio*. *Cf. Morrison*, 561 U.S. at 269 ("[I]f Congress intended such foreign application it would have addressed the subject

---

[12] We recognize that in many instances, especially where the parties to the suit were the parties to the transaction, the fact that the transaction was domestic might well be deemed sufficient to compel the conclusion that the invocation of § 10(b) is also domestic.

43

of conflicts with foreign laws and procedures." (internal quotation marks omitted)). The complaints concern statements made primarily in Germany with respect to stock in a German company traded only on exchanges in Europe. Were this suit allowed to proceed as pleaded, it would permit the plaintiffs, by virtue of an agreement independent from the reference securities, to hale the European participants in the market for German stocks into U.S. courts and subject them to U.S. securities laws. The potential for regulatory and legal overlap and conflict would have been obvious to any legislator who considered the possibility that the statute would result in such an application. Indeed, the fraudulent acts alleged in the complaint have been the subject of investigation by German regulatory authorities and adjudication in German courts. Although we recognize that the plaintiffs allege that the false statements may have been intended to deceive investors worldwide, we think that the relevant actions in this case are so predominantly German as to compel the conclusion that the complaints fail to invoke § 10(b) in a manner consistent with the presumption against extraterritoriality. *Morrison*, 561 U.S. at 266. The complaints thus fail to state a claim upon which relief may be granted.

44

In concluding that these complaints do not state a claim upon which relief may be granted, we do not suggest that the presence of some foreign element in a transaction necessarily means that Congress did not intend to include it in the coverage of § 10(b).  To borrow *Morrison*'s metaphor as to the effect of a minor domestic element on the nature of an overwhelmingly foreign transaction: Section 10(b) would indeed be a craven watchdog against securities fraud if it retreated to its kennel whenever a fraud involved *some* foreign activity.[13]  The potential for incompatibility between U.S. and foreign law is just one form of evidence that a particular application of a statute is extraterritorial.  It is neither a safe harbor nor the only relevant consideration in the extraterritoriality analysis.  It predominates in this case because of the dominance of the foreign elements we have outlined above.

Our decision today in no way forecloses the application of § 10(b) to govern fraud in connection with transactions in securities-based swap

---

[13] "For it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States.  But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case."  *Morrison*, 561 U.S. at 266.

agreements where the transactions are domestic and where the defendants are alleged to have sufficiently subjected themselves to the statute.

The conclusion we have reached on these facts cannot, of course, be perfunctorily applied to other cases based on the perceived similarity of a few facts. In a world of easy and rapid transnational communication and financial innovation, transactions in novel financial instruments—which market participants can freely invent to serve the market's needs of the moment—can come in innumerable forms of which we are unaware and which we cannot possibly foresee. We do not purport to proffer a test that will reliably determine when a particular invocation of § 10(b) will be deemed appropriately domestic or impermissibly extraterritorial. We believe courts must carefully make their way with careful attention to the facts of each case and to combinations of facts that have proved determinative in prior cases, so as eventually to develop a reasonable and consistent governing body of law on this elusive question. We have neither the expertise nor the evidence to allow us to lay down, in the context of the single case before us, a rule that will properly apply the principles of *Morrison* to every future § 10(b) action involving the regulation of securities-based swap agreements in particular or of more conventional securities

generally.  Neither do we see anything in *Morrison* that requires us to adopt a "bright-line" test of extraterritoriality when deciding every § 10(b) case.  While over time a series of judicial opinions may collectively result in one or more such standards, we do not think it appropriate in this case of first impression to attempt to set forth a comprehensive rule or set of rules that will govern all future cases to come before this Court.  Perhaps, in the final analysis, Congress and the Securities and Exchange Commission might be in a better position to craft broader rules in this area in light of their access to hearings, including the testimony of experts, their competence to make policy decisions, and their constitutionally and statutorily ordained roles as makers of law and rules.[14]  It is enough to say that we think our decision in *this* case is compelled by the text of

---

[14] Congress directed the Securities and Exchange Commission to carry out a study "to determine the extent to which private rights of action under the antifraud provisions of the Securities and Exchange Act of 1934 . . . should be extended to cover" domestic conduct in connection with foreign transactions or foreign conduct with domestic effects.  Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 929Y, 124 Stat 1376, 1871 (2010).  But that study, released in April 2012, offered only general options without advocating for any particular approach, further underscoring the complexity of these matters.  *See* SEC Staff, Study on the Cross-Border Scope of the Private Right of Action Under Section 10(b) of the Securities Exchange Act of 1934 (2012), *available at* http://www.sec.gov/news/studies/2012/929y-study-cross-border-private-rights.pdf.

the Exchange Act and the principles underlying the Supreme Court's decision in *Morrison*, as applied to our facts.

We therefore affirm the district court's dismissal of the complaints. Recognizing, however, that our decisions here and in *Absolute Activist* have elaborated on the standards set forth in *Morrison* in such a way that the plaintiffs might conceivably be able to draft amended complaints that would invoke a domestic application of § 10(b), we remand to allow the district court to entertain a motion to amend the complaints.

**CONCLUSION**

For the reasons stated above, we AFFIRM the dismissal of the complaints and REMAND for further proceedings consistent with this opinion.

48

LEVAL, *Circuit Judge,* concurring:

I concur fully in the opinion of the court. I add this separate concurrence to explain my understanding of an aspect of the *Morrison* opinion, in relation to our ruling. Our opinion concludes that "the relevant actions in this case are so predominantly German as to compel the conclusion that the complaints fail to invoke § 10(b) in a manner consistent with the presumption against extraterritoriality." Op. 44.

In reaching that conclusion, we do not identify, or rely on, any single factor or bright-line rule. Our opinion states that the conclusion is based on a number of facts. The claims focus on statements of a prominent German company, primarily made in Germany, concerning the stock of another prominent German company, which is traded on foreign exchanges, but not on any domestic exchange. The defendants were not parties to, nor did they participate in, the plaintiffs' swap agreements. These agreements referenced the German company's stock but did not give the plaintiffs any ownership interest in that stock. The alleged fraud has been investigated by German authorities and was the subject of adjudication in German courts. Consideration of all those facts leads us to observe, "Were this suit allowed to proceed as pleaded, it would

1

permit the plaintiffs, by virtue of an agreement independent from the reference securities, to hale the European participants in the market for German stocks into U.S. courts and subject them to U.S. securities laws. The potential for regulatory and legal overlap and conflict would have been obvious . . . ." Op. 44.

There is language in the Supreme Court's *Morrison* opinion which might be read as commanding that only bright-line, single-factor rules may be employed to determine when an invocation of § 10(b) would be impermissibly extraterritorial. Among *Morrison*'s criticisms of this circuit's longstanding test was that "the presence or absence of any single factor which was considered significant in other cases . . . [wa]s not necessarily dispositive in future cases." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 259 (2010). If *Morrison* intended to command that only bright-line, or single factor, tests be used, we would of course be required in this case to identify and follow a single-factor, or bright-line, test to govern our determination. As I understand *Morrison*, however, that was not its meaning. I believe it would be a mistake, and a harmful one, to so construe *Morrison*. Indeed, reading *Morrison* to permit only bright-line rules would likely undermine its principal holding that § 10(b) has no extraterritorial

application, while also providing unscrupulous domestic securities dealers with easy options to escape the coverage of the antifraud statute.

*Morrison* criticized the test the lower courts had been using on several different grounds. The principal criticism was that it "disregard[ed]" the presumption against extraterritoriality. *See id.* at 255. Instead of presuming that Congress does not legislate extraterritorially absent clear indication of contrary intent, under the conduct-and-effects test, courts "inquir[ed] whether it would be reasonable (and hence what Congress would have wanted) to apply [§ 10(b)] to a given situation." *Id.* at 257.

The second criticism was that, in this "disregard of the presumption," *id.* at 255, lower court rulings in cases such as *Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir. 1968), and *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972), had applied § 10(b) inappropriately in circumstances that should have been governed by foreign law. *See Morrison*, 561 U.S. at 257 ("With *Schoenbaum* and *Leasco* on the books, the Second Circuit had excised the presumption against extraterritoriality from the jurisprudence of § 10(b) . . . .").

Thus, *Morrison*'s principal criticisms of the lower court jurisprudence, for their failure to guard against inappropriate extraterritorial extension of § 10(b),

3

had nothing to do with the courts' employment of a flexible test. What is more, the vice addressed by *Morrison*'s principal criticisms has been substantially cured by *Morrison*'s holding. *Morrison* commands that § 10(b) *not* be given extraterritorial application. Consequently, the main purpose for which courts now must find a useful test is to ensure, in transnational circumstances, that § 10(b) not be given extraterritorial application, while preserving the domestic coverage that Congress intended. Among the main reasons for which we conclude that *Morrison*'s domestic transaction test must be viewed as necessary, but not necessarily sufficient, to justify the invocation of § 10(b) is that otherwise application of the test would in some cases defeat the presumption against extraterritoriality. Given that § 10(b) suits may be brought not only against participants in a securities transaction but against any entity that perpetrated a deception in connection with the purchase or sale, applying § 10(b) whenever a suit arises out of a domestic transaction would require that the United States statute be applied inappropriately in many circumstances to foreign conduct far more suitably governed by foreign law.

There are substantial further reasons why I believe *Morrison* cannot be understood as intending to prohibit the use of flexible, multi-factor tests to guard

4

against extraterritorial application of § 10(b). Most important, the Supreme Court itself in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. ----, 133 S. Ct. 1659 (2013), has construed *Morrison* and its presumption against extraterritoriality in a manner that calls for employment of a flexible, multi-factor analysis. The Court stated that claims under the Alien Tort Statute could be domestic under *Morrison,* even if based on foreign conduct, if they "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." *Id.* at 1669. Whether foreign acts touch and concern the territory of the United States with sufficient force to displace the presumption is not a question susceptible to resolution by any bright-line, single-factor test.

Second, because multi-factor tests are so frequently employed in United States law for all sorts of purposes, we would expect that, if the Supreme Court intended to rule that only bright-line, single-factor tests can be recognized as valid law, it would state that message with unmistakable clarity. I see no such clear condemnation of multi-factor tests in the *Morrison* discussion.

The gist of *Morrison*'s criticism of the conduct-and-effects test as unpredictable—the criticism susceptible to misinterpretation—was that, as courts attributed an intent to Congress that coincided with whatever the particular

5

court thought to be good "policy" for the particular case, *Morrison*, 561 U.S. at 259, courts came to apply the test so inconsistently and unpredictably that it was not a test at all. *See id.* at 255-56 ("That has produced a collection of tests for divining what Congress would have wanted, complex in formulation and unpredictable in application."); *id.* at 259 n.4. ("Even if one thinks that the 'conduct' and 'effects' tests are numbered among Judge Friendly's many fine contributions to the law, his successors, though perhaps under the impression that they nurture the same mighty oak, are in reality tending each its own botanically distinct tree.").

In short, I do not read the Supreme Court's criticism as based on the failure of the lower courts to use a bright-line, or single-factor, test, but rather on the Supreme Court's perception that the lower courts had been disguising as a test an unprincipled approach to decision-making based on little more than the various courts' assessment of good policy for each particular case.

There are in my view still further important reasons to doubt that the Supreme Court intended by those unclear words to command that only bright-line tests could qualify as acceptable law. Use of a bright-line, or single-factor, test for that sort of question would be at odds with the tendency of modern

6

jurisprudence and would lead to seriously undesirable results, likely to be incompatible with the main objectives of the *Morrison* opinion.

The question whether application of § 10(b) to a particular set of transnational facts would be impermissibly extraterritorial has much in common with the choice-of-law question that arises when a court must determine which state or nation's law most appropriately governs a case involving interstate or transnational facts. Over the last half-century, at least in the absence of a binding contractual selection by the parties, courts have overwhelmingly abandoned bright-line tests in favor of more subtle and flexible inquiries for such questions because their complexity does not lend itself to reliable analysis by a bright-line test. *See, e.g., Eli Lilly Do Brasil, Ltda. v. Federal Express Corp.*, 502 F.3d 78 (2d Cir. 2007) (conducting a multi-factor analysis under the Restatement (Second) of Conflict of Laws); *Hataway v. McKinley*, 830 S.W.2d 53, 56-59 (Tenn. 1992) (describing states' rejection of the bright-line rule of *lex loci delicti* in favor of more "flexible" approaches in tort cases); *see also* Restatement (Second) of Conflict of Laws §§ 145, 148, 188 (1971); Symeon C. Symeonides, *Choice of Law in the American Courts in 2010: Twenty-Fourth Annual Survey*, 59 Am. J. Comp. L. 303, 331 (2011) (categorizing states' choice-of-law methodologies); Symeon C.

Symeonides, *Choice of Law in the American Courts in 1993 (and in the Six Previous Years)*, 42 Am. J. Comp. L. 599, 600-612 (1994) (collecting cases). The Supreme Court's reasoning in *Kiobel*, which, as noted above, called for a flexible inquiry upon applying *Morrison* to the Alien Tort Statute, is consistent with the modern approach to such questions.

Furthermore, any bright-line, or single-factor, test for determining whether an application of § 10(b) is appropriately domestic would likely suffer from serious defects. A test so insensitive to changes of context would almost certainly be either under-inclusive, failing to protect the domestic securities markets and thus failing to carry out Congress's purpose, or (as with *Morrison*'s domestic transaction requirement if construed as not only necessary but also sufficient to make § 10(b) applicable) over-inclusive, compelling applications of § 10(b) to foreign conduct far more appropriately covered by foreign law, and thus contradicting the main thrust of *Morrison*.[1]

---

[1] Because § 10(b) applies not only to frauds by a party to a securities transaction against the counterparty, but also to any frauds that are "in connection with" a securities transaction, the mere fact that the securities transaction was domestic does not prevent application of the statute to frauds that are in all other respects foreign. Applying § 10(b) in such cases of overwhelmingly foreign facts could not be reconciled with *Morrison*'s admonition that the presumption against extraterritoriality is not a "timid sentinel" that "retreat[s] . . . whenever *some* domestic activity is involved in the case." *Morrison*, 561 U.S. at 266. Notably,

8

Additionally, a bright-line rule would perversely offer safe harbors for fraud. Bright-line rules can be highly beneficial in many circumstances, especially those involving good-faith dealings, because they support predictability and permit good-faith enterprises to plan for allocation of risk. But this same quality makes bright-line rules problematic when employed to govern those who operate in bad faith. Bright-line rules (unless seriously over-inclusive) would permit unscrupulous securities dealers to design their transactions with their victims so as to stay on the side of the line that is outside the reach of the statute. Defrauded victim investors would have no recourse to the law Congress passed to secure the integrity of U.S. securities markets. This would defeat the longstanding principle enunciated by the Supreme Court that § 10(b) "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes," *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (internal quotation marks

---

*Morrison* did not confront this kind of scenario, in which all the other facts point in the opposite direction from the solitary fact that triggers the bright-line rule. In *Morrison*, the most significant facts uniformly corroborated the impermissible extraterritoriality of this invocation of the statute. Not only were the securities transactions conducted in Australia among Australians, but the case involved "*foreign* plaintiffs suing [primarily] *foreign* [as well as some] American defendants for [foreign] misconduct in connection with securities traded on *foreign* exchanges." *Id.* at 250-51 (emphasis added).

9

omitted), and to protect against fraudulent practices, which "constantly vary," *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971).

For all these reasons, most particularly the Supreme Court's own words and reasoning in *Morrison*, and in *Kiobel* when it undertook to apply the rule of *Morrison*, I do not read *Morrison* as prohibiting the use of a flexible, multi-factor test to ensure that § 10(b) not be applied extraterritorially.